MACON, DUBLIN & SAVANNAH RAILROAD COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90592.  Promulgated December 22, 1939.

*Harold J. Gallagher, Esq.*, for the petitioner.
*Conway N. Kitchen, Esq.*, for the respondent.

#### OPINION.

HILL: Respondent determined a deficiency in petitioner's income
tax liability for the year 1933 in the amount of $3,206.48.  Such de-
ficiency results from respondent's holding that petitioner, sometimes
hereinafter called the M. D. & S., was not affiliated during the taxable
year, within the purview of the applicable revenue act, with the Sea-
board Air Line Railway Co., hereinafter for convenience called the
Seaboard.

Petitioner was included in a consolidated income tax return filed
by the Seaboard for 1933, and it is conceded that if petitioner was
not affiliated with Seaboard in that year for tax purposes, the de-
ficiency determined by respondent is correct, but if so affiliated, no
deficiency in tax is due.

The Revenue Act of 1932, in section 141 (a), (d), provides that.
an *affiliated group* of corporations shall have the privilege of filing
a consolidated return for the taxable year in lieu of separate returns,
and defines the term "affiliated group" as meaning one or more
chains of corporations connected through stock ownership, if at least
95 per centum of the voting stock of each corporation, except the
parent, is owned directly by one or more of the other corporations
and the parent corporation *owns directly* at least 95 per centum of
the voting stock of one of such other corporations.  Thus, the ultimate
question presented for decision here is whether or not Seaboard

*owned directly* at least 95 per centum of the stock of the M. D. & S. during the taxable year.

Petitioner is a railroad corporation, organized under the laws of the State of Georgia, with its principal office at Macon, Georgia, and its principal accounting office in Portsmouth, Virginia.

The Seaboard Air Line Railway, also referred to as Seaboard, a railroad corporation organized under the laws of Virginia and other states and predecessor of the Seaboard Air Line Railway Co., purchased all of the outstanding securities of the M. D. & S. from the Atlantic Coast Line Co. in January 1907, pursuant to an agreement dated October 11, 1906. The securities so acquired by Seaboard included all of petitioner's outstanding capital stock, consisting of 20,400 shares.

On October 23, 1907, the board of directors of Seaboard adopted a resolution authorizing a committee to sell, under advice of counsel, all or any part of the company's holdings of M. D. & S. stock, reserving an option, if the committee deemed it advisable or practicable, to repurchase the stock at a figure to be determined by the committee.

Pursuant to such resolution, Seaboard entered into a written agreement dated November 29, 1907, with S. D. Loring & Son of Boston, Massachusetts, sometimes hereinafter referred to as Loring, whereby Seaboard purported to sell to the latter firm 11,000 shares of M. D. & S. stock for a consideration of $1,000, and Seaboard purportedly was granted an option to repurchase the stock at any time within five years for the sum of $2,000. The instrument further provided that the stock should be transferred into the name of S. D. Loring & Son and deposited with the New York Trust Co., endorsed or assigned in blank, to be held by the trust company subject to the terms of the instrument.

At the time of the transfer of stock to Loring, the shares had a value substantially in excess of the "purchase price." At the time the purported option to repurchase was granted by Loring, and at the dates of subsequent similar options hereinafter referred to, the 11,000 shares of stock had a value substantially in excess of the respective option prices.

It was further provided in the agreement between Seaboard and Loring that if Seaboard exercised its "option to repurchase" within the five-year period, the trustee should deliver the 11,000 shares to Seaboard and the stock should "thereupon become the absolute property of Seaboard Air Line Railway, its successors or assigns." The agreement also provided that until Seaboard exercised its option, S. D. Loring & Son should be "clothed with all rights of ownership, and * * * entitled to all rights and privileges incident to said stock." Each of the subsequent agreements hereinafter mentioned contained similar provisions.

Petitioner offered evidence to establish that, although the transaction between Seaboard and Loring took the form of a sale with an option to repurchase, Loring had no intention to buy, and Seaboard had no intention to sell, the 11,000 shares of petitioner's stock. The understanding of both parties was that Loring would act as nominee of the stock for Seaboard. Loring regarded the transaction as an accommodation to Seaboard, with which the firm then had close connections.

The transaction between Seaboard and the Loring firm was negotiated in behalf of the latter by Homer Loring, who, at the suggestion of Seaboard, became president and a director of the M. D. & S. during the time the stock stood in the name of his firm. However, Loring never participated in the management of the M. D. & S. nor attended any of its stockholders' or directors' meetings. Loring executed proxies for the annual meetings of the M. D. & S. in accordance with the request of Seaboard. The stock was not considered an investment by Loring and was not carried as such on its books.

In 1912 Loring requested Seaboard to relieve the firm of its relationship to the 11,000 shares of M. D. & S. stock. Thereupon the secretary of Seaboard made arrangements with one James A. Blair, Jr., of New York City, to transfer the stock into his name. Blair at that time was associated with Blair & Co. which controlled Seaboard.

A written assignment was executed by Loring to Blair, dated November 23, 1912, for the recited consideration of $2,000 in cash. On the same date Loring and Seaboard by letter directed the New York Trust Co. to cause the 11,000 shares of petitioner's stock to be transferred into the name of Blair and to continue to hold the stock subject to the terms of the option agreement. A written instrument was executed between Blair and Seaboard under date of November 29, 1912, which purported to grant to Seaboard an option to repurchase the shares of stock from Blair within one year for $2,120. This instrument was substantially the same as that previously executed by Loring and Seaboard. The purported option price represented the $2,000 paid by Blair, plus 6 percent interest. The agreement was renewed from year to year to and including November 29, 1924.

It was the intention of both parties to the agreement between Seaboard and Blair that Blair was to serve as Seaboard's nominee. Blair considered that Seaboard was the owner of the stock, and consented to have the stock transferred into his name as an accommodation to Seaboard. Blair did not regard the stock as an investment. He served as president and director of the M. D. & S. during the time the stock stood in his name, but took no part in its management and re-

ceived no compensation. He executed proxies for the annual meetings in accordance with instructions of officers of Seaboard.

In 1915, during which year the 11,000 shares of stock stood in Blair's name, the Seaboard Air Line Railway was consolidated with another company to form Seaboard Air Line Railway Co., which succeeded to all of the rights of the Seaboard Air Line Railway in the M. D. & S. stock.

The Seaboard had agreed on request to take the 11,000 shares of stock out of Blair's name at any time, and accordingly at his request in 1925 Seaboard arranged to transfer the stock to the Continental Trust Co., Baltimore, Maryland, hereinafter called Continental. The relationship between Seaboard and Continental at that time was close, and has continued through the Maryland Trust Co., Continental's successor, down to the present time. In 1925 the president of Continental was also president of Seaboard.

On November 14, 1930, the Maryland Trust Co., successor to Continental, executed a written instrument purporting to grant to Seaboard an option to repurchase the 11,000 shares of petitioner's stock within one year for $4,265.86, the recited consideration for the transfer of the stock from Blair to Continental. Provision was made for an automatic annual extension of the so-called option up to and including November 14, 1935, and thereafter until 60 days after notice of termination by the trust company.

In October 1933 petitioner's outstanding capital stock was reduced from 20,400 to 17,500 shares, and this resulted in the reduction of the number of shares held by the Maryland Trust Co., from 11,000 to 9,434 shares. The agreement of November 14, 1930, was amended accordingly.

In entering into the transactions above mentioned, neither the Continental Trust Co. nor the Maryland Trust Co. had any intention to buy, nor did Seaboard have any intention to sell, the 11,000 shares of petitioner's stock. At the time the stock was transferred to it, Continental made no inquiry as to the value of the stock, and considered the amount paid to Blair as an advance to Searboard. Both Continental and the Maryland Trust Co. caused their nominees, in whose names the stock was registered, to follow Seaboard's instructions as to voting and giving proxies in respect of the stock.

At the hearing respondent objected to admission of the evidence offered by petitioner to show that the transactions above mentioned were in fact not what they purported to be according to the terms of the various written instruments. The objection is based on the ground that the testimony violated the parol evidence rule. The presiding Board Member reserved ruling on the objection until consideration of the case on the merits.

Decision of the issue submitted herein turns upon this point.

On brief respondent quotes an extract from Jones on Evidence to the effect that "parol evidence can not be received to contradict, vary, add to or subtract from the terms of a valid written instrument", and argues that such rule is applicable in suits involving third persons, not parties to the written instrument. Respondent further contends that one of the chief functions of the parol evidence rule is to protect innocent third parties, and says that admission in evidence of the oral testimony offered by petitioner "would prejudice an innocent third party, namely, the Commissioner of Internal Revenue."

We are unable to agree with the respondent's contentions. If it be true that Seaboard did in fact own directly more than 95 percent of petitioner's capital stock during the taxable year, then under the statute there is no deficiency in tax due from petitioner, and it is difficult to comprehend, in the absence of any considerations invoking equitable estoppel, how the admission of evidence to establish the true facts could be prejudicial to the rights of respondent, or how in that connection he could properly be regarded as an innocent third party. We see no question of estoppel involved here. There is no suggestion that respondent has been induced to change his position to his injury in reliance upon the written instruments in controversy, and hence, if no tax is due, respondent has no rights in the premises and is not an innocent third party. Surely, the doctrine urged by respondent, even if applicable in some circumstances, could not be invoked by respondent to permit him to collect as a tax, upon a purely technical ground, an amount not rightly owing by petitioner.

In support of the second proposition that the parol evidence rule is applicable in cases involving third persons who are not parties to the written instrument, respondent cites *Pugh* v. *Commissioner*, 49 Fed. (2d) 76, affirming 17 B. T. A. 429; certiorari denied, 284 U. S. 642; and also *Mountain Producers Corporation*, 34 B. T. A. 409, which was reversed by the Circuit Court at 92 Fed. (2d) 78, which decision of the Circuit Court was reversed at 303 U. S. 376.

The *Pugh* decision, we think, is not in point. There the parol evidence, excluded by the Board, was offered to show that the parties to a written instrument had agreed that the depletion allowance on oil sold by Pugh should go to him, contrary to the terms of the statute allowing such deduction only to the owner, which there was the purchaser from Pugh. The court held that parol evidence could not be used "to give to the recorded instrument an effect according to the wishes of the parties rather than that attributable to it by law, and thus to control as against the United States the application of the tax laws." The court further pointed out that the parol evidence rule "operates to protect all whose rights depend upon the instrument

though not parties to it", only where such evidence "is offered merely to vary the legal effect" of the terms of the instrument. It is to be noted that the parol evidence offered in the instant case was not intended to vary the legal effect of the terms of the instruments, but to show that the transactions in fact were entirely different from what the instruments purported to indicate.

What we said in *Mountain Producers Corporation, supra*, respecting application of the parol evidence rule was not necessary to a decision of any issue in the case, and the point was not discussed in the opinion of either the Circuit Court of Appeals or the Supreme Court. We are not persuaded, therefore, in the light of the conclusions reached below, that the decision in that case is authority for application of the parol evidence rule in the case at bar. In other cases cited by respondent, parol evidence was held inadmissible for the purpose of interpreting or construing the terms of written instruments. Such decisions are so obviously distinguishable from the instant proceeding as not to require discussion here.

Application of the parol evidence rule under the facts of the present case would be inconsistent with the broad, general principles of construction applied to taxing statutes. "Taxation is an intensely practical matter; and laws in respect of it should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences." *Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204. To deny petitioner the right here to show the true and controlling facts respecting affiliation and thereby to require payment of a tax not lawfully due would, it seems to us, be both unjust and oppressive.

Again, it was said by the court in *Central Life Assurance Society* v. *Commissioner* (C. C. A., 8th Cir.), 51 Fed. (2d) 939, 941, that it is a basic principle in the application of tax laws that substance and not mere form be regarded as governing. Substantially the same view was expressed by another court in *Board* v. *Commissioner* (C. C. A., 6th Cir.), 51 Fed. (2d) 73, 75, where it was said that "tax laws should be applied, as equitable principles are applied, with regard to substance rather than to form."

While extraneous evidence is not generally admissible for the purpose of construing the terms of a written instrument, "it is competent to show by parol what the transaction was." *Brick* v. *Brick*, 98 U. S. 514, 516. In determining the true nature of a transaction, this Board is not confined "to an inspection alone of the written instruments by which it was consummated." Extraneous evidence is admissible "to inform it of the material facts bearing upon it." *Commissioner* v. *Neighbor Realty Co.*, 81 Fed. (2d) 173, 175.

The question of the application of the parol evidence rule, in cases similar to the present proceeding, has been specifically considered by

us many times and its application uniformly denied. In *J. W. Solof*, 1 B. T. A. 776, we admitted parol evidence to show that a transfer of stock, described in a written instrument as a sale, was in fact a loan, saying at page 785:

The rule against varying or contradicting writings by parol evidence obtains only in suits between and is confined to parties to the writing and their privies and has no operation with respect to third persons nor even upon the parties themselves in controversies with third persons. [Citing authorities.]

This rule is supported by the great weight of authority. See 22 C. J. 1291, 1292, ¶ 1725.

*Arthur B. Grover*, 3 B. T. A. 508, held that a written instrument, in form a contract creating the relation of principal and agent, was in fact a contract for the sale of land.

In *Stratton Grocery Co.*, 8 B. T. A. 317, oral evidence was admitted to show that a written contract for the sale of the assets of a corporation, which purported to include therein only one item of good will at a profit, was intended to include two items of good will at cost.

*Dome Co.*, 26 B. T. A. 967, involved a question of affiliation which turned upon the ownership of stock as in the present case. There it appeared that one Robbins was the owner of a portion of the stock in controversy; the certificates were issued in his name; the contract recited that he was a stockholder; and he was made an officer and director of the company. On extraneous evidence, we held that Robbins was merely the nominee of Warner Brothers, saying: "But, in the absence of estoppel, the corporate record will not serve to bind petitioner if it is contrary to facts, as we believe it was."

In *United National Corporation*, 33 B. T. A. 790, the taxpayer delivered certain stock to another corporation, subject to a purported repurchase agreement. Notwithstanding the transaction was described in the written agreement between the parties as an absolute sale, subject to the right to repurchase, we held on the evidence that the transfer was not a sale but security for a loan, and that hence no taxable profit was realized thereon by the petitioner.

In many cases both this Board and the courts have denied loss deductions claimed on transactions appearing from contracts or other written instruments to be sales, where such instruments were contradicted or varied by other evidence indicating a lack of intent to change ownership. See cases cited in *United National Corporation*, *supra*, beginning on page 799.

In *Indianapolis Glove Co.* v. *United States* (C. C. A., 7th Cir.), 96 Fed. (2d) 816, the court pointed out that the parol evidence rule could not be invoked by a third person not a party to the written instrument, and held that, in an action to recover income taxes paid, oral evidence was properly admissible to show that purported pur-

chases of taxpayer's stock by its employees were in fact intended as additional compensation, contrary to the terms of the written instruments involved.

Respondent's objection to the admission of the oral testimony in the present case is overruled, and exception noted.

Respondent makes one further contention which requires brief consideration, namely, that even if admissible the oral evidence establishes only beneficial ownership in Seaboard of the 11,000 shares of petitioner's stock, and this does not meet the statutory requirement of direct ownership. In other words, respondent here urges the proposition that ownership through a nominee is not "direct ownership." This contention, in our opinion, is not only untenable but contrary to the conclusions reached in G. C. M. 7331, C. B. VIII–2, p. 135, the syllabus of which reads as follows:

Where a parent corporation, for a legal intra vires purpose, has placed the record ownership of a share of stock of a subsidiary in a nominee, such nominee being at all times legally obligated to hold and deal with such share according to such orders and directions as the parent corporation may, from time to time, give him, the ownership of the parent corporation is "direct" within the meaning of section 141 (d) of the Revenue Act of 1928.

Section 141 (d) of the Revenue Act of 1928 is identically the same in terms as section 141 (d) of the 1932 Act, which governs the instant proceeding.

The direct ownership required by the statute is not merely possession of the naked legal title, but beneficial ownership, which carries with it dominion over the property. Any other conclusion would lead to absurd and ridiculous results. For illustration, if Seaboard had transferred to the Continental Trust Co., as its nominee, the legal title to more than 95 percent of petitioner's stock, for some lawful *intra vires* purpose, would the *trust company* and petitioner thereby have become affiliated and entitled to file a consolidated return within a fair interpretation of the "direct ownership" clause of section 141 (d)? To state the question is to indicate its answer beyond the need of discussion. "But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed * * *", that is, the beneficial ownership. *Corliss* v. *Bowers*, 281 U. S. 376, 378.

We hold that petitioner was affiliated with Seaboard during the taxable year, and hence there is no deficiency in tax due from petitioner.

*Decision will be entered for the petitioner.*