MIAMI NATIONAL BANK, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 580-74. Filed February 14, 1977.

---

*David Emanuel,* for the petitioner.
*Kevin A. Suffern* and *Alan Summers,* for the respondent.

OPINION

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioner's corporate income taxes:

| *FYE Apr. 30—* | *Deficiency* |
|---|---|
| 1970 | $394,746.52 |
| 1971 | 833,513.58 |

The parties have settled numerous issues; the only one remaining for decision is whether the petitioner, Miami National Bank, was eligible to file a consolidated return with Data Lease Financial Corp. (Data Lease). That issue turns on whether Data Lease "owned directly," within the meaning of section 1504(a) of the Internal Revenue Code of 1954,[1] certain stock which was held in a subordinated securities account with a broker.

All of the facts have been stipulated, and those facts are so found.

The petitioner is a corporation which maintained its principal place of business in Miami, Fla., when it timely filed its petition herein. The petitioner filed a corporate income tax return for the period May 1, 1969, through December 15, 1969. For the period December 16, 1969, through June 30, 1970, and for the fiscal year ending June 30, 1971, it joined in the consolidated returns filed by Data Lease.

During the years in issue, the petitioner had issued and outstanding 1,084,733 shares of voting common stock, its only

---

[1] All statutory references are to the Internal Revenue Code of 1954.

class of stock. Eighty percent of such stock was 867,787 shares. Sometime prior to September 18, 1969, Data Lease offered to purchase 870,000 shares of the petitioner's stock from Samuel Cohen and others (the sellers), and on September 18, 1969, Data Lease and the sellers executed an agreement of sale and purchase of such stock, under which part of the purchase price consisted of a promissory note. The closing of the agreement was held on December 16, 1969, at which time Data Lease delivered to the sellers the full purchase price for the 870,000 shares of stock but physically received the certificates to only 837,129 shares, which it owned throughout the years in issue.

The remaining 32,871 shares, the certificates for which were not delivered to Data Lease at the time of the closing, constituted a portion of the shares due from Mr. Cohen. At the closing, Mr. Cohen intended to make a present transfer to Data Lease of the ownership rights he had in such shares, but on the closing date, and continuously thereafter until May 25, 1972, such shares were held in a "subordinated securities account" with First Devonshire Corp. (First Devonshire or the broker).

Mr. Cohen set up the subordinated securities account with the broker on July 19, 1969, by a subordination agreement. Such agreement recited that Mr. Cohen, the "customer," for himself and his assigns, agreed to subordinate his claims, as owner, creditor, or otherwise, with respect to such account, to the claims of all other creditors of the broker, for any matters arising prior to the maturity date of the agreement, December 31, 1970. Until the maturity date, Mr. Cohen could not withdraw the securities from the account without prior written consent of an officer of the broker. However, at any time during the course of the agreement, he could reacquire the securities in his account if he substituted for them either cash or other readily marketable securities of equivalent value. Mr. Cohen also retained the right to the dividends and to vote the shares of stock in his account.

No provision in the agreement prohibited Mr. Cohen from assigning his rights to any securities in the account, and the agreement expressly stated that it was binding on Mr. Cohen's assigns. The broker agreed to pay Mr. Cohen interest on the stock in his account at the rate of 4 percent per annum.

The agreement enabled the broker to take such stock into account in meeting the net capital requirements of rule 325 of the New York Stock Exchange, as in effect when the agreement was signed.

Other relevant provisions of the agreement are set forth below:

in the event of any receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, whether or not pursuant to bankruptcy laws, liquidation, or any other marshalling of the assets and liabilities of the Corporation, the Customer shall not be entitled to participate or share ratably or otherwise, in the distribution of the assets of the Corporation until all claims of all other present and future creditors of the Corporation arising out of any matter occurring prior to the Maturity Date have been fully satisfied, or provision has been made therefor.

Any money, securities, other property, or interests therein, in said account or accounts may be used, pledged, sold, disposed of or transferred or otherwise treated by the Corporation as its own property and such money, securities, other property, or interests therein, in said account or accounts or the proceeds of sale thereof may be applied by the Corporation to the claims of all other creditors of the Corporation as fully to all intents and purposes as though the same were property of the Corporation.

If any of the securities, other property or interests therein in said account or accounts are sold, transferred or disposed of by anyone to whom such securities, other property or interests therein have been pledged, the Customer shall have a contract claim against the Corporation for the return of like securities, other property, or interests therein, to the same extent he would have had he loaned the securities, other property, or interests therein, to the Corporation at the time of sale, but such contract claim shall be and remain subordinated to the claims of all other creditors as above provided. * * *

[Paragraphed for emphasis.]

The broker issued brokerage statements to Mr. Cohen on a monthly basis from July 1969 to June 1972 with respect to his account. In those statements, the broker reported Mr. Cohen's account as "long" on 60,261 shares of the petitioner's stock. However, during that period, the broker was listed as record owner of such shares.

Throughout the period in issue in this case, dividends on the 32,871 shares of the petitioner's stock, held in Mr. Cohen's subordinated securities account and to be delivered to Data Lease, were treated as follows: Dividend payments were made by the petitioner to the record owner, First Devonshire, and it then paid them to Mr. Cohen or credited them to his account. Data Lease treated such amounts as its income on its books

and records and as payments on the unpaid purchase price owed to Mr. Cohen.

In August 1970, the New York Stock Exchange suspended First Devonshire from further trading, and the Securities and Exchange Commission secured the appointment of a receiver for First Devonshire by the United States District Court for the Southern District of New York. In the following month, the receiver sought and secured authority to sell the securities in subordinated securities accounts, but such authority was never exercised.

In late September 1970, the creditors of First Devonshire filed a petition for involuntary bankruptcy. In the following month, First Devonshire was adjudicated a bankrupt, and a receiver was appointed. On October 24, 1970, such receiver notified Mr. Cohen of his intention to liquidate the securities in Mr. Cohen's subordinated securities account, unless Mr. Cohen substituted cash or readily marketable securities for them within 30 days thereafter. In October 1970, the receiver in bankruptcy was authorized to sell securities held in subordinated securities accounts, but such authority was never exercised by him.

On December 30, 1970, a petition was filed, on behalf of all customers of First Devonshire with subordinated securities accounts, seeking to restrain the receiver from selling their securities or treating them any differently than those of other customers. By order dated March 17, 1971, the relief sought in the petition was granted pending the outcome of the issues raised in such petition. On April 20, 1972, or sometime thereafter, the restraining order was lifted, and on May 25, 1972, Mr. Cohen delivered to First Devonshire $291,295.85 in cash and received certificates for 60,061 shares of the petitioner's stock which had been in his account throughout the period in issue in this case. Throughout such period, Mr. Cohen could have reacquired 32,871 such shares because he had sufficient resources to substitute for them. In July 1972, Mr. Cohen physically delivered to Data Lease certificates for 32,871 shares of the petitioner's stock.

The petitioner filed a corporate income tax return for the short period May 1, 1969, through December 15, 1969. It then filed consolidated returns in accordance with the fiscal years of Data Lease ending June 30, 1970, and June 30, 1971. In the

notice of deficiency, the Commissioner determined that Data Lease did not own 80 percent of the petitioner's stock and that consequently the petitioner was required to file separate returns for its fiscal years ending April 30, 1970, and April 30, 1971. The Commissioner also made a number of other adjustments which have been settled by the parties.

The petitioner's right to file consolidated returns with Data Lease for the periods at issue in this case depends on whether, during such period, Data Lease "owned directly" within the meaning of section 1504(a)[2] at least 80 percent of the voting power of all classes of the petitioner's stock. The parties agree that at the closing of the agreement between the sellers and Data Lease, the sellers intended to transfer, and Data Lease intended to acquire, ownership of more than 80 percent of such stock. The only disagreement involves whether Data Lease became at such time the owner of the portion of Mr. Cohen's stock held in the subordinated securities account with the broker.

In deciding whether corporations are affiliated, only stock owned "directly" is taken into consideration. "Directly" is used to exclude tracing ownership through shareholders or other common interests. See *West Boylston Mfg. Co. of Alabama v. Commissioner,* 120 F.2d 622 (5th Cir. 1941), affg. a Memorandum Opinion of this Court; *Roger Morris Realties, Inc.,* 27 B.T.A. 924, 925–926 (1933). "Direct" is not used to restrict ownership to those situations in which the corporation has legal title to the stock. Corporations which are in effect one business unit because of their actual ownership have been allowed to file a consolidated return, regardless of who is the record owner of the stock. See S. Rept. No. 960, 70th Cong., 1st Sess. 14–15 (1928); *Lavenstein Corp. v.*

---

[2] Sec. 1504(a) provides in relevant part:

(a) DEFINITION OF "AFFILIATED GROUP."—As used in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if—

    \* \* \*

(2) the common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations.

As used in this subsection, the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.

*Commissioner,* 25 F.2d 375, 376 (4th Cir. 1928), revg. 6 B.T.A. 1134 (1927); *Macon, Dublin & Savannah Railroad Co.,* 40 B.T.A. 1266, 1273 (1939); *Thomas F. Bayard, Trustee,* 38 B.T.A. 778, 788 (1938). If consolidation were allowed to turn on mere legal or record ownership, then corporations with no real common ownership or economic relationship could consolidate their income and deductions, in clear violation of the statutory purpose. See *Lavenstein Corp. v. Commissioner, supra* at 377; *Macon, Dublin & Savannah Railroad Co., supra* at 1273.

In a variety of factual settings, the courts have held that the beneficial owner was the owner for purposes of filing a consolidated return. For example, in connection with nominee situations, pledges, and other security arrangements, the courts have consistently ruled the beneficial owner to be the "direct owner" for purposes of the consolidated return provisions. E.g., *Lavenstein Corp. v. Commissioner, supra; Dome Co.,* 26 B.T.A. 967 (1932); *Industrial Cotton Mills Co.,* 22 B.T.A. 648 (1931), revd. on another issue 61 F.2d 291 (4th Cir. 1932); *Avenue Agency & Loan Corp.,* 17 B.T.A. 1039 (1929); *Savannah River Lumber Co. et al.,* 14 B.T.A. 165, 193 (1928); *Farmers & Merchants Bank,* 10 B.T.A. 447 (1928); *American Steel Co.,* 7 B.T.A. 641 (1927); *Boston Structural Steel,* 1 B.T.A. 1004 (1925); see *Frelmort Realty Corp.,* 29 B.T.A. 181 (1933). Similarly, the courts have held that a corporation could not file a consolidated return with another when it was merely the titleholder of the shares of the second corporation. *West Boylston Mfg. Co. of Alabama v. Commissioner, supra; Connery Coal & Investment Co. v. Commissioner,* 84 F.2d 485 (7th Cir. 1936), affg. a Memorandum Opinion of this Court.

The Commissioner advances a number of arguments in support of his position that Data Lease was not the "direct owner" of the shares held in the subordinated securities account with First Devonshire. First, the Commissioner contends that when the subordinated securities account was established, Mr. Cohen relinquished his ownership of the stock to First Devonshire and that he could not have transferred such ownership to Data Lease.[3] The Commis-

---

[3] The Commissioner's position herein appears to be inconsistent with that adopted by him in his revenue rulings, where he has held that the customer of the subordinated accounts, and not the broker, is the beneficial owner of the securities

sioner recognizes that for purposes of the consolidated return provisions, ownership means beneficial ownership, but he contends that only in nominee or escrow situations is beneficial ownership sufficient to comply with the statutory ownership requirements. He argues that since the stock held in the subordinated securities account could be sold to satisfy the creditors of the broker, it became subject to the risks of the broker's business and that the rights so acquired by the broker are far more substantial than those of a nominee or escrow agent.

In order to determine Mr. Cohen's interest in the stock held in the subordinated securities account, we must interpret the subordination agreement and decide what legal relationships were created thereby. Throughout the period the stock was held in the account, First Devonshire sent Mr. Cohen monthly statements in which the stock was recorded as "long" in his account, thus signifying that the parties thought of him as the owner throughout the period. See *Gordon v. duPont Glore Forgan, Inc.*, 487 F.2d 1260, 1261 and n. 1 (5th Cir. 1973); *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365, 369 (1st Cir. 1973).

In addition, the subordination agreement expressly reserved substantial rights for Mr. Cohen. He was given the right to the dividends on the stock and the right to vote it so long as it was held in the account. He also had the right to withdraw the stock on the termination of the account. Throughout the period, he had a right to reacquire the stock by substituting cash or other readily marketable securities of equivalent value.[4] Cf. *Estate of Harriet Blair Borland*, 38 B.T.A. 598, 601 (1938). Nor was Mr. Cohen's right of substitution merely an idle one, since at all times he possessed sufficient resources to exercise such right, and indeed, he ultimately did so. Furthermore, if the stock was sold in

---

and thus taxable on the income therefrom. See Rev. Rul. 69–455, 1969–2 C.B. 9; see also Rev. Rul. 74–178, 1974–1 C.B. 196; Rev. Rul. 73–122, 1973–1 C.B. 66.

[4] The Commissioner contends that Mr. Cohen's right of substitution was illusory because its exercise could be prevented by First Devonshire. However, we believe that the Commissioner has misunderstood the subordination agreement. Under that agreement, Mr. Cohen had an unfettered right to substitute cash or property described in the agreement; and although there might be a disagreement as to whether the tendered property complied with the contract, First Devonshire could not unreasonably or arbitrarily refuse to accept a tender.

accordance with the subordination agreement, the amount of Mr. Cohen's claim against the broker was based upon the value of the stock at the time of the sale, not as of the date of the agreement. Thus, it was Mr. Cohen, not the broker, who was to receive the benefit of any appreciation in the value of the property or bear the burden of any decrease in its value.

The parties have differing views as to the rights of First Devonshire under the subordination agreement. The Commissioner suggests that First Devonshire could dispose of the stock at its pleasure, but the petitioner urges that its power to do so was restricted to situations in which it incurred financial difficulties. Although the terms of the agreement are not explicit, they do refer only to dispositions occurring because of financial difficulties, and in connection with a virtually identical agreement, the Court of Appeals for the District of Columbia held that the broker's power to dispose of stock was restricted to situations in which it was in financial difficulties. *Stahl v. United States*, 441 F.2d 999, 1002 (D.C. Cir. 1970). In any event, it is clear that First Devonshire never did sell Mr. Cohen's stock, and under the agreement, Mr. Cohen retained all his rights with respect to the stock until it was sold. Cf. *Renton Investment Co.*, 46 B.T.A. 279, 289, 290 (1942).

The law recognizes that an owner of personal property may transfer possession of it to another person for a specific purpose and create a bailment, and that the bailee may also be given the power to acquire or transfer title to the property under specified conditions. See, generally, 8 Am. Jur. 2d 934–938 (1963). Whether such a bailment is created depends upon the intent of the parties, and we are satisfied that such a bailment was created by the subordination agreement. In such a bailment, the bailor remains the beneficial owner of the bailed property, and thus, beneficial ownership was retained by Mr. Cohen while his stock was held in the subordinated account. Since the ownership referred to in section 1504(a) is beneficial ownership, regardless of the arrangement by which it is created, it follows that there is no merit in the Commissioner's attempt to limit or restrict qualifying beneficial ownership to that resulting from nominee or escrow arrangements.

In the decided cases, the courts have found that subordination agreements like the one herein have created bailments in which the customer remained the owner of the stock during the bailment. In *Stahl v. United States, supra,* also an income tax case, the court had before it a subordination agreement virtually identical with the one herein: there, too, the securities were subject to the risks of the broker's business and could be sold if necessary to meet the claims of creditors. The Government contended that upon the execution of the agreement, the broker became the owner of the securities and the account owner became its creditor. The court rejected such a characterization and held that the agreement created a bailment so that the account owner remained the owner of the securities. In view of that conclusion, the court held that the customer's loss was an ordinary loss and not a bad debt. Likewise, *Shearson, Hammill & Co. v. State Tax Commission,* 19 App. Div. 2d 245, 241 N.Y.S.2d 764 (3d Dept. 1963), affd. 15 N.Y.2d 608, 203 N.E.2d 912 (1964), dealt with subordinated securities accounts of individual partners in a securities brokerage firm, and held that the interest, dividends, capital gains, and losses from such securities were attributable to the individual partners, and not the firm. The court viewed the transaction as a pledge, with the individual partners as the pledgors and the firm acting as the pledgee.

The Commissioner also argues that even if Mr. Cohen remained the owner of his stock after the creation of the subordinated securities account, the bankruptcy of First Devonshire and the appointment of a receiver resulted in a shifting of ownership to First Devonshire. In support of such argument, he points to the provisions of the subordination agreement dealing with the rights of the customer in the event of the insolvency of First Devonshire. However, he misconstrues such provisions. They do not provide for a transfer of ownership when the broker becomes insolvent; they merely indicate that if the securities are sold as a result of the insolvency of the broker, the customer then becomes a creditor of the broker, and his rights as a creditor are subordinated to the claims of other creditors. Cf. *Renton Investment Co., supra.* Since Mr. Cohen's stock was never sold, those provisions of the subordination agreement never became operative. Thus, although the insolvency of First

Devonshire increased the risks that Mr. Cohen's stock might be sold to satisfy the creditors of First Devonshire, the insolvency turned out to have no effect on his ownership of the stock. Moreover, the fact that Mr. Cohen's stock was eventually returned to him, after he substituted cash therefor, shows that the parties to the subordination agreement did not consider that he had relinquished his ownership as a result of the insolvency of First Devonshire.

The remaining contentions of the Commissioner may be disposed of more rapidly. He asserts that, by virtue of the subordination agreement, Mr. Cohen could not transfer his rights to the shares in the subordinated securities account. However, the Commissioner again misconstrues the agreement, for nowhere does it prohibit Mr. Cohen from assigning his interest in the securities held in his account. Furthermore, the agreement impliedly recognized the possibility that Mr. Cohen might assign his interest in the account because it was stated to be binding on his assigns.

Finally, the Commissioner contends that even if Mr. Cohen could have validly transferred his ownership interest in the shares held in the account, he never did so on December 16, 1969, because he did not make physical delivery of the certificates on that date. In other words, the Commissioner asserts that beneficial ownership of stock cannot be transferred without actual delivery of the certificates. However, the agreement of sale between Data Lease and Mr. Cohen provided that Florida law was to apply in interpreting the agreement, and the agreement was executed and carried out in Florida. Under Florida law and for purposes of Federal income taxation, beneficial ownership of stock does not depend upon physical possession of the stock certificates; it depends upon the agreement and intention of the parties. See, e.g., *Phillips v. Zimring*, 284 So.2d 233 (Fla. App. 1973); *Alfred N. Hoffman*, 47 T.C. 218, 232–233 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968); *Charles Chaplin*, 46 B.T.A. 385, 394 (1942), revd. on another ground 136 F.2d 298 (9th Cir. 1943); *Thomas F. Bayard, Trustee*, 38 B.T.A. at 791; *Doernbecher Manufacturing Co.*, 30 B.T.A. 973, 978, 987 (1934), affd. 95 F.2d 296 (9th Cir. 1938). Here, it is undisputed that the parties to the agreement intended that ownership pass upon the closing of the agreement on December 16, 1969. Furthermore,

the parties demonstrated their intent by the manner in which the dividends on such property were handled. Data Lease was treated as the owner of such amounts by crediting them toward payments due Mr. Cohen and by including them as income on its books and records.

In conclusion, we hold that on December 16, 1969, Data Lease became the beneficial and "direct" owner of the necessary portion of the stock in the subordinated securities account and that the petitioner was entitled, as of that date, to file a consolidated return with Data Lease.

*Decision will be entered under Rule 155.*