Ruby Smith STAHL

v.

UNITED STATES of America,
Appellant.

No. 23179.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 10, 1970.

Decided Nov. 23, 1970.

Mr. David English Carmack, Atty., Department of Justice, of the Bar of the Court of Appeals of Maryland, *pro hac vice*, by special leave of Court, with whom Asst. Atty. Gen. Frederick B. Ugast, Messrs. Lee A. Jackson, Atty., Department of Justice, and David G. Bress, U. S. Atty., at the time the brief was filed, were on the brief, for appellant. Miss Issie L. Jenkins, Atty., Department of Justice, also entered an appearance for appellant.

Mr. Sidney J. Silver, Washington, D. C., for appellee.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case comes on appeal by the Government from a judgment of the District Court [1] awarding $5,532 plus interest to a taxpayer in an action for refund of overpayment of federal income tax. Because we hold that on the disputed item taxpayer was entitled to take a deduction, for a loss on a transaction entered into for profit, we affirm.

## I. The Facts

On April 12, 1962, Mrs. Ruby Smith Stahl, a widowed musician and music teacher, turned securities with a market value of approximately $210,000 over to

---

1. Reported at 294 F.Supp. 243 (D.D.C.1969).

Balogh & Co., a Washington securities firm. Under an agreement between Mrs. Stahl and the firm, the securities were to be used by the firm as part of its capital so that the firm could satisfy certain SEC requirements. The securities were to be returned to her on May 12, 1963, subject, however, to the claims of all of the firm's creditors, present and future. In return Mrs. Stahl received one percent of the value of the securities per quarter, in addition to the dividend and interest income. She also became a member of the board of directors of the firm but attended only one meeting and never received notice of the others.

A subsequent agreement between the taxpayer and the firm provided that one half of the securities would be returned to her on December 15, 1963, and the other half on September 15, 1964. On October 31, 1963, however, the firm sold the securities for $257,078.90. In August, 1964, the firm filed a petition in bankruptcy. The petition showed that its liabilities exceeded its assets by more than $300,000. The bankruptcy proceedings were still pending before the District Court when it entered judgment in the case at bar.

The taxpayer claimed an ordinary loss of $87,146 (based on the $127,012 of the securities less an expected "recovery" in bankruptcy of $39,866) on her amended tax return for 1963. The Internal Revenue Service disallowed the deduction on the ground that the loss was not an ordinary loss but a capital loss in the nature of a nonbusiness bad debt. Furthermore, treatment of the loss as a nonbusiness bad debt was disallowed for 1963 since the debt was not wholly worthless at the end of that year.[2] The taxpayer

paid the additional assessment and brought this suit for refund.

The taxpayer and the Government agree that the loss is deductible in some manner at some point in time; the dispute is over the proper characterization of the loss and hence its proper tax treatment. The District Court, agreeing with the taxpayer, held that the agreement between the taxpayer and the securities firm created not a debtor-creditor relationship but a bailment, and that the loss was consequently deductible under section 165(c) of the Internal Revenue Code, which allows deductions for losses incurred in a trade or business and losses incurred in a transaction entered for profit.[3] The Government adheres to its contention that the loss was deductible under section 166(d) of the Code as a nonbusiness bad debt.

A § 166(d) loss, as contended by the Government, is subject to limitations disadvantageous to the taxpayer. A § 165 (c) loss is deductible from ordinary income. In contrast a § 166(d) loss is treated like a short-term capital loss,[4] and as such is first applied so as to reduce low-taxed long-term capital gains (under § 1201). Any excess of loss over capital gains is deductible from ordinary income only to the extent of $1000 (under § 1211). The limitations of § 166 would be applicable even though profits earned from the transaction were taxable at ordinary income rates—rates actually paid by the taxpayer in the case at bar on profits earned in 1962. The consequence is that a taxpayer with a stand-off—because an earlier profit of, say, $10,000 was followed by a loss of equal amount,—would be subject to an overall increase in taxes.[5] This result

2. Int.Rev.Code of 1954, § 166(d) (1) (B) allows a deduction for a nonbusiness bad debt when it "becomes worthless within the taxable year."

3. The District Court did not rule whether the loss was deductible under § 165(c) (1) as a loss incurred in a trade or business or under § 165(c) (2) as a loss incurred in a transaction entered into for profit.

4. Technically speaking, a section 166(d) loss is "a loss from the sale or exchange * * * of a capital asset held for not more than 6 months."

5. To illustrate, and oversimplifying tax rates for purposes of illustration: Take the case of a taxpayer, in the hypothetical but easy-to-calculate "50% bracket", who receives income in the amount of $10,000 (from a percentage compensa-

was mandated by Congress where the ensuing deductions fell into the category of nonbusiness bad debts. We must consider whether Congress intended it to apply in a case like the one before us.

## II. Inapplicability of bad debt provisions

Section 166 of the Internal Revenue Code is captioned "Bad Debts." The section is applicable,—whether what is involved are business bad debts governed by (a), or nonbusiness bad debts governed by (d),—only in case "of a bona fide debt." [6] Carrying forward the concept of bona fide debt, Treasury Regulation § 1.166–1(c), 26 C.F.R. § 1.66–1(c) (1970), provides:

> Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166.

A. Debt Not Established by Taxpayer's Loan of Securities to Corporation.

The District Court found no "debtor-creditor relationship" in this case. The Government leans on the recurrent use of the words "loan" and "indebtedness" in the agreement between Mrs. Stahl and Balogh and Company. But "[t]he decisive factor is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties." Byerlite Corporation v. Williams, 286 F.2d 285, 290 (6th Cir. 1960). This "real intention" is to be deduced from the "substance of a transaction," upon which the incidence of taxation depends. Comm'r of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Professed intentions and labeling must give way if the court finds on supporting evidence that in reality the transaction was something other than a debt. Diamond Bros. Company v. Comm'r, 322 F.2d 725, 731 (3d Cir. 1963).

The Government argues that "[w]hen securities are delivered in order to provide capital for another, and subject to the use of another, it is reasonable to assume that their 'return' can be satisfied by return of equivalent securities or cash," so that in substance, as well as label, this transaction was a loan and its consequence a debt.

The case presents an issue of the meaning of the statute, involving an ascertainment of Congressional intent, and also an issue of the understanding of the parties. Since the Government wishes to establish a general rule that the loan of securities gives rise to a debt, by reference to a putative reasonable assumption that the parties mean the obligation to be dischargeable by a return of securities or cash equivalent, it would doubtless concede the argument to be inapplicable if in a particular case that is not at all what the parties contemplated or agreed. Both as a general rule, and as to the parties before us, we cannot "assume" that the obligation to return securities in kind may fairly be taken as including a general option to return the cash equivalent. The point is simple: The return of a cash equivalent presumes a decision to sell. When to sell is an investment decision. Indeed timing is of the essence of the art of investment, both in buying and selling. There is no basis for "assuming" an intent to give the

---

tion) and then has a loss of $10,000 the next year from application of assets to the firm's creditors. Assume no change in value of securities or tax rates. From this stand-off taxpayer would have a net increase in taxes of approximately $2500: The first year taxpayer would have to pay a tax on $10,000 income and the tax burden would be $5,000. The second year taxpayer would apply the $10,000 loss to reduction of long-term capital gains, on which approximately $2500 in taxes would have been payable, and the consequence of the loss is a reduction of only $2500 in taxes. If taxpayer had no such other long term gains, the tax detriment, though more complicated as a matter of arithmetic, would be as great if not greater.

6. H.R.Rep.No.1337, 83rd Cong., 2d Sess. A47 (1954).

bailee free dominion to make this investment decision for the bailor. What is more fairly intended to be conveyed was the power to sell upon the appearance of the need and occasion contemplated by the agreement, the unfulfilled demands of the firm's creditors. The power to sell, by fair implication, is a power conveyed for response to a contingency. The conditional nature of this authority is underscored by the consideration that its exercise involves for the bailor not only an investment decision but tax consequences—of current liability for taxes on otherwise unrealized gains.

The conditional nature of any obligation to pay money is of significance in view of the rule that the bad debt deduction provisions are applicable only in case of an unconditional obligation of the debtor to pay the creditor. Milton Bradley Co. v. United States, 146 F.2d 541, 542 (1st Cir. 1944). And perhaps even more important than the contingent nature of any "obligation to pay a fixed or determinable sum of money," as set forth in the Treasury regulation, is the fact that even the obligation of the brokerage firm to return the securities loaned to it was subject to a condition. Mrs. Stahl expressly agreed to subordinate her right to return of the securities to the claims of all creditors of Balogh, agreed that they would be "subject to the risks of Balogh's business," and in ¶ 5, agreed that—

> Neither the loan of the aforesaid securities, nor this agreement may be terminated, rescinded, or modified by mutual consent or otherwise, if the effect thereof would be inconsistent with the conditions of Rule X-15 C3-1 issued by the Securities and Exchange Commission pursuant to the Securities Exchange Act, or to reduce the net capital of Balogh below the amount required by said rule. (JA 44–45)

Balogh was thus under no absolute liability to pay, a *sine qua non* of the debtor-creditor relationship required to satisfy Section 166.[7] In United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967), cert. denied 389 U.S. 953, 88 S. Ct. 335, 19 L.Ed.2d 362 (1967), the taxpayer made advances to a corporation controlled by her grandson-in-law. Her advances were subordinated to the corporation's indebtedness to other creditors and it was generally understood that repayment was contingent upon the success of the business. The court held that there was no "genuine indebtedness" created within the meaning and scope of the Internal Revenue Code.

In our view the corporation's undertaking to taxpayer was not a "debt." The transaction is too substantial a departure from the essence of the concept of "debt," both the classic concept and the concept set forth in the Treasury's regulations. *Cf.* Gilbert v. Comm'r, 248 F.2d 399, 402–403 (2d Cir. 1957). The authorities discussed above have generally been concerned with the problem whether a transaction is more accurately to be termed a debt or a capital contribution. We think the same core concept is applicable in this case, where we conclude that what is involved constitutes neither a debt nor a capital contribution but is a bailment transaction entered into for profit but with risk of loss.

B. Debt Not Established by Sale of Securities Loaned to Corporation In Which Taxpayer Had No Prior Interest.

An alternative contention by the government is that even if no "debt" was created by the bailment agreement, such a debt came into being when Balogh sold the securities, under the rule of Putnam v. Comm'r, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956). *Putnam* held that the loss resulting from an individual's guaranty of corporate obligations is a nonbusiness bad debt and thus deductible only as a short-term capital loss. The decision was based upon the "familiar rule" that, *"instanter* upon

---

7. *See* Zimmerman v. United States, 318 F.2d 611 (9th Cir. 1963) and cases therein cited at 612, n. 4.

the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt." 352 U.S. at 85, 77 S. Ct. at 176 (footnote omitted).

The theory of *Putnam* rests on the determination by the Court that what was involved was a pre-existing debt by the corporation,—"not a new debt", the Court noted; that this debt came into the hands of the taxpayer by subrogation; and that the corporation's inability to pay the debt made applicable the bad debt deduction provision, in that case the provision for nonbusiness bad debts.

■ The taxpayer here did not guarantee Balogh's debts; she gave that company securities for its use in satisfaction of the S.E.C. capital requirements, in the expectation of a 1% per quarter return (over and above the dividends and interest received from the securities). When taxpayer's securities were sold by Balogh she suffered a loss. She was not subrogated to any pre-existing debt of the corporation to its creditors. The base of the *Putnam* decision is missing.

When *Putnam* issued, critics objected that its reasoning made tax consequences dependent on arrangements and forms of no practical consequence, requiring that distinctions be drawn between contracts of indemnity (which do not involve subrogation and succession to a debt) and contracts of guaranty. Recent opinions have declared that the *Putnam* principle is applicable, whether or not there is technical subrogation to a debt, in all cases where a taxpayer holding stock in a corporation has made an undertaking (whether or not involving subrogation) in order to protect or enhance his proprietary interest in a corporation. These cases hold that the "essence" of *Putnam* is to protect "the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing." Stratmore v. United States, 420 F.2d 461, 465 (3d Cir.) cert. denied 398 U.S. 951, 90 S.Ct. 1870, 26 L.Ed.2d 291 (1970), followed in United States v. Hoffman, 423 F.2d 1217 (9th Cir. 1970).[8]

We assume, at least for present purposes, that *Putnam* bears a broad "economic" reading in situations where the transaction represents financing provided to a corporation by a taxpayer-stockholder to protect his pre-existing investment. In that situation, it may be noted, the betterment sought by the taxpayer from the transaction would include increases in value of his investment, which would be taxable when realized only at capital gain rates, and hence there is reason for restriction to capital loss treatment of a transaction that fares badly. But in the case before us, taxpayer was not a shareholder in the corporation to which she gave her securities. Hence there is no room for a contention that what is involved is only a transaction relating to an outstanding capital investment. Where that capital hue does not color the transaction, the "nonbusiness bad debt" treatment of *Putnam* is not applicable when the relationship in-

8. The *Stratmore-Hoffman* opinions thus substantially undercut the critics of *Putnam* who objected to the Court's reliance on the common law concept of subrogation as generating irrational distinctions within the tax system. *See e. g.*, 71 Harv.L. Rev. 192, 193 (1957): "If the contract were one of indemnity, rather than guarantee, there would generally be no subrogation and no succession to the original debt; thus the loss might not qualify as a bad debt under the Court's analysis."

In *Stratmore* the court indicated that a stockholder who is also an officer might justify the debt as related to the business of being an officer, at least where that was a "primary" motivation. It was held that Stratmore had not shown the relationship to that business to be a "significant" motivation. See 420 F.2d at 463.

**1004**

volves no "debt" in existence prior to the loss, not even a succession, as by subrogation, to the corporation's debt to another. Comm'r of Internal Revenue v. Condit, 333 F.2d 585, 586 (10th Cir. 1964).

### III. Loss Deductible as Sustained on a Transaction Entered Into for Profit

The only intention of taxpayer here was the expectation of compensation received directly, as payment for the availability of taxpayer's securities. This transaction was plainly one entered into for profit.[9]

Any citation of judicial precedent should make reference to Ansley v. Comm'r, 217 F.2d 252 (3d Cir. 1954), because there is some similarity on the facts [10] and the reasoning in the opinion

parallels ours.[11]  The difficulty with *Ansley's* weight as authority is that it preceded *Putnam* and the Government argues that it does not survive *Putnam*. A recent Tax Court opinion contains a reference, in passing, that expresses doubts as to the continuing vitality of *Ansley* in the wake of *Putnam*.[12]  On its own facts the vitality of *Ansley* is doubtful,—impaired by *Stratmore, supra,*—for the taxpayer was a stockholder, and indeed had majority stock ownership, in the corporation whose finances he protected. However, insofar as a loan agreement not referable to any existing debt or investment is concerned we think the reasoning of *Ansley* has merit and survives *Putnam* for the reasons we have already stated. That reasoning establishes the deductibility of the loss before us as one sustained on a transaction entered into for profit.

> "It is clear that the taxpayer sustained his loss because of his agreement to lend his bonds as security for the bank's loan to the corporation. At the time the bonds were loaned to the corporation, no debtor-creditor relationship was established between the taxpayer and the corporation or the bank, so that there was no debt owing to the taxpayer which could have become bad.
>
> \*　　\*　　\*　　\*　　\*
>
> "On July 3, 1947, the bank sold his bonds to satisfy the corporation's note. It was at that time that a definite, identifiable loss was suffered. To say otherwise would be unrealistic, for the taxpayer was in a distinctly different financial situation after the sale. Before the sale he owned bonds worth $30,000; after the sale the bonds belonged to another. Because of the agreement and the loan of the bonds, the taxpayer, who expected to profit from the deal, found himself without the $30,000 worth of bonds."

9. There is no evidence that the taxpayer provided Balogh with the use of her securities because of nonfinancial considerations such as a hobby or avocation, Schley v. Comm'r., 375 F.2d 747 (2d Cir. 1967), artistic purpose, Ewing v. Comm'r., 213 F.2d 438 (2d Cir. 1954), or solely for tax benefits, Lewis v. Comm'r., 328 F.2d 634 (7th Cir. 1964), cert. denied, 379 U.S. 821, 85 S.Ct. 43, 13 L.Ed.2d 32 (1964); *cf.* Morris R. DeWoskin, 35 T.C. 356 (1960). No other reason for the taxpayer's subjecting her securities to the risk of loss in Balogh's business could have predominated over her profit motive. *See, e. g.,* Imbesi v. C.I.R., 361 F.2d 640 (3d Cir. 1966); Knetsch v. United States, 348 F.2d 932 (Ct.Cl. 1965), cert. denied 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966).

10. In *Ansley,* the taxpayer gave a bank $30,000 worth of bonds as security for the bank's loan to a corporation, of which he was president and majority stockholder. The corporation paid him 3% for the use of the bonds. When the corporation failed to meet the bank's demand for payment of the loan, the bank sold the taxpayer's bonds.

11. The Third Circuit Court of Appeals, reversing the Tax Court, held that taxpayer was entitled to a deduction for a loss sustained as a result of a transaction entered into for profit and was not limited by the provisions for nonbusiness bad debt loss. The court observed, 217 F.2d at 255:

12. J. Meredith Siple, 54 T.C. 1, 10 (1970). But the Tax Court was not called upon to define the core of *Putnam*. It had a case where the pledge was part of the agreement for obtaining stock, and the court, by a divided vote, held *Ansley* distinguishable and the case one of a loss on a capital transaction. No such contention is urged by the Government in the case before us.

We do not believe that our ruling ignores the legislative purposes underlying § 166. Congress limited what had been the general deductibility of "bad debts," at least in part because of abuses by taxpayers in situations that were structured as "debts" but in reality were in the nature of gifts.[13] There is no indication that bailment transactions, which may, as in this case, be entered into for profit, lend themselves to this kind of abuse. In any event the only abuse which Congress reached was in the domain of bad debts. In other transactions the taxpayer remained under the burden of establishing that the loss was incurred, *e. g.,* in a transaction entered into for profit.

It may well be that in the interests of consistency a rule could be devised providing that *any* action by an individual taxpayer which either gives credit or facilitates the obtaining of credit by a corporation, be it guaranty, loan, indemnity or bailment, should be given capital loss treatment if financially unsuccessful. But the Congress has not so provided, and the Supreme Court did not purport to speak so broadly in *Putnam.* In the absence of a clear indication, either by Congress or the Supreme Court, that § 166(d) is to be given such a broad reading, we think it sound to apply *Putnam* in accordance with its expressed reasoning of subrogation, at least where the taxpayer has no prior stake in the corporation.[14]

\* \* \*

Taxpayer's loss is not deductible under § 165(c) (1) since it bore no proximate relationship to her trade or business, that of a music teacher. Whipple v. Comm'r, 373 U.S. 193, 201, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963). However, it is cognizable under § 165(c) (2) as a loss incurred in a "transaction entered into for profit, though not connected with a trade or business."

Affirmed.

---

13. The legislative history is set forth in Putnam v. Commissioner, 352 U.S. at 90–93, 77 S.Ct. 175.

14. In finding that the bad debt provisions of the Internal Revenue Code are inapplicable to the transaction at bar, we of course have no occasion to consider whether it might be characterized differently for other purposes. *See, e. g.,* the technical definition of "preferred creditors" in Section 60 of the Bankruptcy Act, 11 U.S.C. § 96 (1964), which includes those persons, designated "customers", who have claims on account of securities loaned to a stockbroker.