MARTIN J. CLYMAN and EVELYN CLYMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clyman v. Commissioner
Docket No. 4488-74.
United States Tax Court
T.C. Memo 1977-200; 1977 Tax Ct. Memo LEXIS 239; 36 T.C.M. (CCH) 838; T.C.M. (RIA) 770200; June 29, 1977, Filed Herbert Rubenfeld, for the petitioners. David A. Schmudde and Walter C. Welsh, for the respondent. TANN ENWALD MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined a $7,760.77 deficiency in petitioners' 1970 Federal *240 income tax. By his amended answer to the petition filed herein, respondent now seeks an increased deficiency of $11,648.08 [1] for such taxable year. Because of concessions by the petitioners, the only issue before us is whether a loss, sustained by petitioners in 1970, when a corporation which was indebted to petitioner Martin J. Clyman in the amount of $48,000 was adjudicated bankrupt, was ordinary or capital in nature. The case was submitted to the Court upon a full stipulation of facts which is incorporated herein by this reference. Petitioners are husband and wife who resided in New York, New York, at the time of filing their petition herein. They filed a joint Federal income tax return for 1970 with the Internal Revenue Service Center at Andover, Massachusetts. At all times material herein, Martin J. Clyman ("Clyman") was a practicing physician in New York City. In 1965, Clyman sought the approval of the New York Stock Exchange to become a subordinated *241 lender for First Hanover Corporation ("Hanover"), a corporation engaged in business as a securities broker and a securities dealer and a member of the New York Stock Exchange. Clyman then owned about one percent of Hanover's nonvoting stock with a total investment therein of less than $2,800. On March 10, 1965, Clyman and Hanover executed an agreement entitled "Subordinated Cash Borrowing from Martin J. Clyman by First Hanover Corporation," which provided: Agreement between MARTIN J. CLYMAN (hereinafter called the lender) and FIRST HANOVER CORPORATION (hereinafter called the corporation). Subject to the terms and conditions hereinafter set forth, the corporation promises to pay to the lender or assigns, at the principal office of the corporation, $48,000.00 on April 1, 1967 and interest at the rate of six% per annum from April 1, 1965. The lender irrevocably agrees for himself, his heirs, executors, administrators and assigns that the obligations of the corporation under this agreement with respect to the payment of principal and interest are and shall be subordinate in right of payment and subject to the prior payment or provision for payment in full *242 of all claims of all other present and future creditors of the corporation, and of any successor corporation, arising out of any matter occurring prior to April 1, 1967, and that, in the event of any receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization whether or not pursuant to Bankruptcy Laws, liquidation, or any other marshalling of the assets and liablities of the corporation or any successor thereto, the holder hereof shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of the corporation, or any successor thereto, until all claims of all other present and future creditors of the corporation, and of any successor thereto, have been fully satisfied, or provision has been made therefor. This loan may not be paid in whole or in part prior to the maturity date without prior notice to the New York Stock Exchange. If the loan is paid in whole or in part on or prior to the maturity date and if at the time of any such payment the corporation was insolvent, the lender agrees irrevocably for himself, his heirs, executors, administrators and assigns, (whether or not such lender had any knowledge *243 or notice of such insolvency at the time of any such payment) to repay to the corporation, its successors and assigns, the sum so paid to such lender, for the benefit of all other creditors of the corporation; provided, however, that any suit for the recovery of any such payment must be commenced within one year of the date of such payment. The unpaid principal of the obligation of the corporation hereunder shall forthwith mature, together with interest accrued thereon, in the event of any receivership, insolvency, bankruptcy, assignment for benefit of creditors, reorganization whether or not pursuant to Bankruptcy Laws, liquidation or any other marshalling of the assets and liabilities of the corporation, or any successor thereto; but payment of the same shall remain subordinate as hereinabove set forth.
Default in the payment of interest shall not accelerate the maturity of the obligation and payment of the obligation shall remain subordinate as hereinabove set forth. This agreement shall be binding upon the lender, his heirs, executors, administrators, successors and assigns. This agreement shall be effective on the date it is approved by the New York Stock Exchange. *244 One of Hanover's purposes in executing the agreement was to satisfy certain net capital requirements for brokers and dealers under section 15(c)(3) of the Securities and Exchange Act of 1934 and the rules and regulations promulgated thereunder (17 C.F.R. sec. 240.15c3-1, as in effect during the relevant year). Subsequently, Clyman entered into two similar agreements with Hanover extending the date of payment of the $48,000 by Hanover to petitioner to March 31, 1968, and March 31, 1969, respectively, and providing for the payment of interest at eight percent per annum.
The parties stipulated that, "Sometime in 1969, First Devonshire Corporation, a corporation engaged in business as a securities dealer and as a stock dealer and a member of the New York Stock Exchange, acquired First Hanover Corporation's assets in First Devonshire Corporation." On July 12, 1969, Clyman entered into a subordinated loan agreement with First Devonshire Corporation ("Devonshire") further extending the repayment date of Clyman's $48,000 advance until December 31, 1970, and providing for interest at eight percent per annum. On September 23, 1970, Devonshire was adjudicated *245 bankrupt and Clyman's $48,000 advance became totally worthless. At all pertinent times, the rate of interest payable to Clyman was in excess of the maximum rate of interest payable on bank deposits and the prime interest rate to major borrowers charged by a leading New York bank. The issue before us is whether the $48,000 constituted a loss incurred in a "transaction entered into for profit" under section 165(c)(2), [2] deductible against ordinary income, or a loss from a contribution to capital, deductible as a capital loss from the worthlessness of a security under section 165(g), or a loss from a nonbusiness bad debt, [3] deductible as a capital loss under section 166(d). Petitioners contend that the transaction neither gave rise to an indebtedness nor constituted a contribution to capital, but rather was a bailment with the result that section 165(c)(2) applies. Respondent, in his argument, shifts back and forth between a contention that the transaction represented an indebtedness from Hanover and then Devonshire to Clyman and a contention that the transaction involved a contribution to capital by Clyman, with the result that petitioners' loss is governed by section 166(d) *246 or 165(g). Respondent's main thrust, however, is directed to the bad debt provision (section 166(d)) and we hold that his contention on this score should be sustained. [4]
Initially, petitioner seeks to avoid the characterization of an indebtedness by pointing to the facts that Clyman subordinated his right to repayment to the claims of all creditors and agreed that the funds would be *247 subject to the risks of the business. Both of these claims are without merit.To be sure, subordination is one element in considering whether an advance is a contribution to capital or a bona fide debt, but it does not in and of itself preclude the latter characterization. See e.g., Commissioner v. O.P.P. Holding Corp.,76 F.2d 11, 12 (2d Cir. 1935), affg. 30 B.T.A. 337 (1934); Monon Railroad v. Commissioner,55 T.C. 345, 360 (1970). See also, Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369, 421-430 (1971). In a similar vein, the argument that an advance is at the risk of the business merely articulates the obvious -- any creditor assumes a risk that his debtor will be in a position to repay a loan. See Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 552 (1968); Plumb, supra at 503-507. The core of petitioners' contention is that the transaction involved herein was a bailment and that they are, therefore, entitled to a deduction for an ordinary loss on the authority of Stahl v. United States,294 F. Supp. 243 (D. D.C. 1969), *248 affd. 441 F.2d 999 (D.C. Cir. 1970). In that case, the taxpayer delivered certain securities to a securities firm as a loan so that the firm could comply with the net capital requirements of the Securities and Exchange Commission. Return of the same securities was scheduled for a date certain; however, the taxpayer agreed to subordinate her claim for return of the securities to the claims of all present and future creditors of the firm. Both courts concluded that the transaction lacked significant indicia of a debt and was, in substance, a bailment entered into for profit, the loss from which was deductible under section 165(c). The court of appeals rejected the Government's contention that the bailee had a general option to return the cash equivalent (441 F.2d at 1003-1004) and the district court rejected the notion that, because the taxpayer could recover money damages if her agreement with the securities firm were breached, the bailment is converted to debtorcreditor relationship (294 F. Supp. at 244).[5]
*249 Unlike the situation in Stahl, Clyman advanced cash. A bailment arises when "the identical thing delivered is to be returned to the deliveror." Brown, Personal Property, sec. 10.5 (3d ed. 1975). When money is the item delivered, a bailment is created only where the identical coins or bills transferred are to be returned and, in the absence of contrary evidence, the presumption is that no bailment is created upon the delivery of money.See Brown, Personal Property, supra; 8 Am. Jur. 2d sec. 37. Compare People v. Thomas,83 App. Div. 226, 82 N.Y.S. 215 (1st Dept. 1903); Foulkrod v. First Nat. Bank of Waterloo,70 Misc. 2d 616, 334 N.Y.S. 2d 285 (Seneca County Ct. 1972). Whatever the precedential reach of Stahl may be, it is clearly distinguishable and affords no support for petitioners' position herein. That Clyman may originally have had the choice of transferring either cash or marketable securities to Hanover and then to Devonshire, [6] so that such firms might meet their net capital requirements, is beside the point. The fact is that he did not transfer securities. The agreements as executed simply obligated Hanover and then Devonshire *250 to pay Clyman an amount of cash equivalent to that advanced; as such they did no more than create a debtor-creditor relationship. Upon Devonshire's bankruptcy in 1970, petitioners were entitled to deduct the amount of obligation only as a nonbusiness bad debt under section 166(d). To reflect the computation of petitioners' deficiency as shown in respondent's amended answer, Decision will be entered under Rule 155. Footnotes
1. Respondent contends that he miscomputed the alternative tax on capital gains in the deficiency notice. Petitioners have raised no objection to this computation should respondent prevail on the substantive issue.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue.↩
3. The record contains nothing to indicate that Clyman was in the trade or business of making advances. ↩
4. The record herein is severely lacking in evidence concerning the facts and circumstances necessary to an evaluation of respondent's capital contribution contention. See and compare Copley v. Commissioner,T.C. Memo. 1968-77. Moreover, we note that because of the amount of capital gains reported by petitioners for 1970, their tax liability would be no different whether we find they are entitled to a long-term or short-term capital loss deduction in respect of the $48,000 advance. See Siple v. Commissioner,54 T.C. 1, 8↩, n.5 (1970).
5. Cf. Meyer v. Commissioner,T.C. Memo. 1975-349↩, where a contract to deliver stock was not converted into a debt because of remedial measures available to the purchaser upon the seller's failure to deliver.
6. The only document indicating such a choice is a form of financial supplement to Clyman's application to the New York Stock Exchange where both the words cash and securities appear in bracketed succession with neither being crossed out.↩