WALTER W. CRUTTENDEN and FAY T. CRUTTENDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cruttenden v. Commissioner
Docket No. 9037-75.
United States Tax Court
T.C. Memo 1978-4; 1978 Tax Ct. Memo LEXIS 514; 37 T.C.M. (CCH) 8; T.C.M. (RIA) 780004; January 3, 1978, Filed Lewis M. Porter, Jr., for the petitioners. Harmon B. Dow, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax for the taxable year 1971 in the amount of $12,644. The issues for decision are as follows: 1. Whether legal expenses paid by Petitioner Fay T. Cruttenden to recover securities from a brokerage firm of which she was a shareholder represent a loss on a transaction entered into for profit under section 165(c)(2), [1] or were ordinary and necessary expenses paid for the management, conservation, or maintenance of property held for the production of income under section 212(2); 2. Whether legal expenses paid by Petitioner Fay T. Cruttenden to recover interest on a loan to the corporation were ordinary and necessary expenses paid for the collection of income under section 212(1); and 3. Whether expenses for legal advice in connection with making a loan of securities is an ordinary *516 and necessary expense for the management, conservation or maintenance of property held for the production of income under section 212(2). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and supplemental stipulation of facts and attached exhibits are incorporated herein by reference. Mr. Walter W. Cruttenden, Sr. (hereinafter referred to as Walter, Sr.), and Mrs. Fay T. Cruttenden (hereinafter referred to as petitioner) are husband and wife and at the time of filing their petition were legal residents of Corona del Mar, California. In 1971 petitioner and her husband filed a joint U.S. Individual Income Tax Return with the Internal Revenue Service Center at Fresno, California. On January 3, 1963, petitioner lent $100,000 to Command Securities, Inc. (Command) at six percent interest under a loan agreement which subordinated the debt to other obligations of the corporation. On March 1, 1963, petitioner acquired 500 shares of Command for $50,000 cash. Command, formerly Cruttenden and Co., Inc., was a California corporation engaged as a broker dealer in securities. *517 Command was a member of the Midwest Stock Exchange and the Pacific Coast Stock Exchange at all times involved in the instant case. Mr. Walter W. Cruttenden, Jr. (Walter, Jr.), and Mr. James R. Cruttenden (James), are the sons of petitioner and Walter, Sr., and along with petitioner owned the controlling interest in Command. As of January 30, 1970, they held over 83 percent of Command's voting stock and approximately 70 percent of all Command stock. Petitioner owned 18 percent of Command voting stock. Petitioner and Command entered into another loan agreement on December 7, 1964, under which petitioner lent certain securities and cash to Command. [2] The agreement provided that Command could use the securities and cash in its business and allowed Command to hypothecate the securities to secure loans from banks or other lenders. Petitioner could withdraw any of the securities upon substituting cash or other securities of comparable quality and value. Upon termination of the loan any cash or securities belonging to petitioner would be returned to her and if the exact securities were not available Command agreed to deliver to petitioner securities which were acceptable to her and *518 of a comparable quality and value. The agreement also provided that the right to demand or receive payment or return of the borrowed securities, whether in the form of securities or cash was expressly subordinated to the claims of all present and future general creditors of Command. In May 1969, Walter, Jr., and Mr. Anthony K. Nex discussed an idea (Command concept) which was designed to provide certain services to independent broker dealers, in order to eliminate a substantial portion of the independent broker dealers' overhead. The Command concept included providing computerized account services, handling certain mutual fund transactions, providing research ideas, and providing the opportunity for independent broker dealers to handle underwritings in coordination with other broker dealers. As a result of this discussion Mr. Nex was employed by Command to implement the Command concept. Two additional corporations were organized (Command Group, Inc. and Command Management, Inc.). Command Group, Inc., was organized to own the *519 computer that would be used in accomplishing the back office customer accounting operations. Command Management, Inc., was organized to provide managed account services. Its function was to offer the broker-dealer an opportunity to place large individual accounts under professional management. The management of the three Command companies anticipated operations in 11 western states. To operate a block trading department (Command concept) successfully a substantial amount of working capital was required. However, Command's financial condition was inadequate to implement the Command concept and, therefore, it was necessary to obtain the necessary working capital from outside sources. Walter, Sr., [3] was the owner of 4,000 shares of ARA Services stock during 1969. He consulted with his attorney, Mr. Donnelly, to examine the possibilities of lending his shares of ARA Services stock to Command. Walter, Sr., was an officer of Walston and Co. He sought legal advice concerning the transfer of his ARA Services stock because he was concerned about possible conflicts of interest and SEC violations due to his position with Walston and Co. On September 16, 1969, he lent the 4,000 *520 shares to Command pursuant to the December 7, 1964, loan agreement between petitioner and Command. No evidence was introduced to show the terms of this transfer regarding the date of repayment, interest charged, if any, or what agreement, if any, existed between petitioner and Walter, Sr., or petitioner and Command (all dividends of ARA stock were delivered to petitioner by Command). On December 19, 1969, Command borrowed $730,000 from the First National Bank of Chicago, Chicago, Illinois. Command pledged certain securities as collateral for this loan which included Walter, Sr.'s, 4,000 shares of ARA Services stock. In addition, Command borrowed $91,000 from the Harris Trust and Savings Bank, Chicago, Illinois. The collateral used for this loan was comprised of stock which petitioner transferred to Command pursuant to the loan agreements. The loan obtained from the First National Bank of Chicago was an "in-transit" loan. [4] Walter, Sr., who at the time of the loan negotiations lived in California, agreed to send the ARA Services stock to the bank if *521 it would agree to lend Command $730,000. The bank did in fact lend the money to Command but did not receive the ARA stock and proposed to terminate the agreement with Command and call the loan if it did not receive the ARA stock as collateral. Mr. Donnelly conferred with bank officials to resolve this problem. Pursuant to this conference, the ARA stock was delivered to the bank. During December 1969, officers of Command discussed the possibilities of selling Command to Systems Capital Corporation (Systems). Mr. Nex, who was Command's executive vice president, was working in Command's Chicago office and was in the process of promoting the Command concept. He became aware of these discussions with Systems and was in favor of selling only a part of the Command companies. In December 1969, Mr. Nex went to Phoenix to meet with the board of directors of Systems to further discuss the acquisition by Systems of the Command companies and to explain the Command concept. At that meeting, Mr. Nex told Don L. Benscoter, president of Systems, that before Systems decided to acquire the Command companies he should wait until *522 Command's audit was completed. Mr. Benscoter expressed an interest in the Command concept and was not primarily concerned with Command's upcoming audit. [5]
On January 6, 1970, Mr. Benscoter issued a news release announcing that Systems had entered into negotiations to acquire the three Command corporations. Systems eventually entered into an agreement with the shareholders of Command to acquire all of Command's outstanding capital stock in exchange solely for voting shares of its own stock. This agreement, entitled Stock Exchange Agreement and Plan of Reorganization Between Systems Capital Corporation and the Shareholders of Command Securities, Inc., was dated January 30, 1970. Systems also entered into similar acquisition agreements with the shareholders of Command Group, Inc., and Command Management, Inc., to acquire all the *523 stock of those corporations. These agreements were subject to the approval of the Pacific Coast Stock Exchange. On April 15, 1970, the Pacific Coast Stock Exchange granted its approval of the proposed exchanges of stock and reorganizations and the closing under the agreements occurred on the same day. At the closing, Systems delivered voting shares of its own stock and no other consideration in exchange for all outstanding stock of the Command corporations. Petitioner (as a creditor) entered into an agreement with Systems whereby Systems agreed to repay or cause Command to pay to petitioner the cash and securities she lent to Command within six months following approval of the exchange agreement and plan by the Pacific Coast Stock Exchange. This agreement, entitled Repayment Agreement, was dated January 30, 1970, and, in part, provided: The parties hereto desire to formulate a plan whereby the rights of creditors will be protected by Systems and Command in order to induce creditors to freely permit the acquisition of outstanding stock of Command by Systems. The approval of the exchange agreement and plan by the pacific Stock Exchange on April 15, 1970, established a due *524 date of October 15, 1970, for the return to petitioner of her subordinated property under the repayment agreement. The Systems stock issued to the former shareholders of Command in exchange for their Command stock was pledged by the shareholders as collateral to secure performance by Systems and Command on their obligation under the repayment agreement. Mr. Nex continued as an officer of Command which became a wholly owned subsidiary of Systems. He went to banks in Los Angeles in an effort to obtain a loan on the strength of Systems' balance sheet. His efforts were fruitless. Mr. Benscoter sent Mr. Nex to a top official of the Bank of America in Los Angeles to obtain capital but this too proved to be in vain. As a result, Mr. Nex formed an opinion that Systems was in financial difficulty. In May or June of 1970, Mr. Benscoter met with petitioner and her husband Walter, Sr., to negotiate an extension of the date on which Systems would return petitioner's cash and securities pursuant to the repayment agreement. Systems and Command failed to return the cash and securities to petitioner on October 15, 1970; Systems' attorney advised Mr. Donnelly, petitioner's attorney, that *525 the cash and securities would not be forthcoming because Systems did not have sufficient funds on hand as of October 15, 1970. As a result of the discussions with Systems' attorney, Mr. Donnelly decided that the extended due date Systems was seeking for the return of petitioner's cash and securities would be much sooner than an ultimate disposition of a suit for specific performance of the repayment agreement. Therefore, Mr. Donnelly proceeded to negotiate with Systems for an extensio of the due date conditioned upon an agreement with Systems which, in Mr. Donnelly's opinion, would form the basis for a summary judgment against Systems in the event it should default again. A new agreement dated February 16, 1971, was entered into between petitioner and Systems which provided for an extension of the due date to June 30, 1971. In addition, Systems agreed to return petitioner's cash and securities except for 2,000 shares of ARA Services stock which Systems agreed to return to petitioner no later than March 10, 1971. [6] Pursuant to this agreement Systems and Command executed an Agreement for Covenant not to Sue, releasing any claim, defense, setoff or counterclaim they might have *526 against petitioner arising out of the warranties or representations, covenants or obligations contained in the exchange agreement and plan. The following was paid and returned to petitioner as provided in the February 16, 1971, agreement: (a) Cash of $100,000 representing the principal amount of Command's promissory note dated January 2, 1963, payable to petitioner; (b) Cash of $10,552.64; (c) $10,054.40, representing interest at six percent per annum accrued from July 1, 1969, to February 16, 1971, on the $100,000 due on Command's promissory note, dated January 2, 1963, payable to petitioner; and (d) The following securities having an aggregate fair market value when returned of $594,207: 4,000 shares *527 of ARA Services, Inc. 1,372 shares American General Insurance 1.80 Pfd. 372 shares American General Insurance (common) 20 shares Criterion Insurance
500 shares Lender International Industries
Petitioner and Walter, Sr., paid legal fees in 1971 totaling $21, 764.47 to Mr. Donnelly's law firm which represented them in connection with the January 30, 1970, repayment agreement and the subsequent related negotiations and deducted them on their 1971 joint Federal income tax return as an itemized miscellaneous deduction, "legal fees for recovery of subordinated securities loaned to Command Securities." The Commissioner, in his statutory notice of deficiency, determined that the deduction of $21,774 claimed on the 1971 joint Federal income tax return, for "legal fees for recovery of securities loaned to Command Securities" was not allowable because petitioner and Walter, Sr., did not show that they were entitled to such a deduction. OPINION Petitioner contends that the legal expenses paid to recover the securities and cash from Command of which she was a shareholder are deductible under the provisions of section 165(c)(2) and, in the alternative, under section 212(2). Petitioner *528 further contends that the legal expenses paid to recover interest (six percent) on the $100,000 lent to Command in 1963 was an ordinary and necessary expense for the collection of income under section 212(1). In addition, petitioners take the position that legal expenses paid by Walter, Sr., for advice in connection with making a loan of his ARA Services stock to Command in 1969 was an ordinary and necessary expense paid for the management, conservation or maintenance of property held for the production of income under the provisions of section 212(2). Respondent contends that the legal expenses paid by petitioners were expenses incurred by a shareholder in the acquisition of stock during a reorganization, and thusly, are capital expenditures which increase the basis of the stock received by the shareholder. In the alternative respondent's argument is threefold. First, the expenses paid in recovering the principal of the 1963 loan to Command ($100,000 at six percent per annum) are not currently deductible but represent capital expenditures. [7] Secondly, respondent contends that the legal expenses paid by petitioners do not represent a loss on a transaction entered into for profit *529 under section 165(c)(2). In support of this contention, respondent argues that the loans of securities are debts under section 166 which precludes the application of section 165. Finally, respondent argues that the legal expenses paid do not come under the application of section 212 for the reason that such expenses are either capital in nature or personal. Petitioner Fay T. Cruttenden (petitioner) owned 18 percent of the voting stock of Command, a brokerage firm in which she had invested $150,000. In December 1964 petitioner lent securities and cash to Command under loan agreements whereby the loans of stock were subordinated to other debts of the corporation. In 1969 Walter W. Cruttenden, Sr., retained counsel for advice as to the possibility of lending his ARA Services stock (4,000 shares) to Command under the same agreement *530 whereby petitioner lent securities by having the stock placed in the loan account to Command in 1964. Walter, Sr., pursuant to his counseled advice, made such a transfer. These securities were used as collateral by Command in obtaining a loan from the First National Bank of Chicago, Chicago, Illinois. When the First National Bank became concerned over the fact that it had not received the securities from Los Angeles, Walter, Sr., again retained counsel. On this occasion the attorney for Walter, Sr., negotiated with bank officials to persuade them not to call the loan which would have resulted in the bank's liquidating the collateral pledged to secure the note. The collateral included ARA Services stock. The attorneys for Walter, Sr., were successful and the loan was not called. Subsequently, the same attorneys for Walter, Sr., were retained for the purpose of recovering the cash and securities lent by petitioner to Command. The negotiations involved in the recovery began in January 1970 and continued until July 1971. The negotiations resulted in two repayment agreements, the second of which resulted in the recovery of petitioner's $100,000 loan made to Command in 1963, $10,054.40 *531 which represented interest of six percent per annum accrued from July 1, 1969, to February 16, 1970, on the $100,000 loan made to Command in 1963, repayment of cash of $10,552.64 to petitioner, and return of securities which included the 4,000 shares of ARA Services stock. Petitioner contends that the legal expenses paid as discussed above had their "genesis" in petitioner's status as a lender. Petitioner further contends that her loans to Command come under the application of section 165(c)(2) and, therefore, the legal expenses are fully deductible. In support of this contention petitioner argues that Command was in desperate need of additional operating capital. Command had developed a concept which promised to be highly lucrative. However, as Mr. Nex testified, the concept could not be implemented without adequate financing. As a result of Command's expectations and need for additional capital, it looked to its shareholders for the needed capital. Petitioner argues that in order to protect her investment in Command, loans of cash and securities were made to Command whereby Command used such securities as collateral for borrowing the needed capital. It is axiomatic that petitioner *532 expected the value of her Command stock to increase in value due to the high expectations placed in potential of the Command concept. A similar fact situation arose in a case cited by petitioners. Ansley v. Commissioner,217 F.2d 252 (3d Cir. 1954), reversing a Memorandum Opinion of this Court. In Ansley, the principal stockholder of a corporation borrowed $28,000 at two percent interest from a bank secured by his U.S. Treasury bonds which had a value of $30,000. The stockholder then lent the corporation $30,000 at five percent interest. Subsequently, the corporation borrowed $30,000 at two percent interest from the same bank. The corporation then cancelled its note to the stockholder by paying him $28,000. At the same time the stockholder agreed to leave his bonds with the bank as collateral for the $30,000 borrowed by the corporation. In conjunction with this loan the bank agreed to pay the stockholder three percent for the use of his bonds as security. The bonds would be returned to the stockholder when the corporation paid off the $30,000 loan. The corporation defaulted in its note to the bank and the bank sold the stockholder's bonds to satisfy *533 the $30,000 loan to the corporation. The Court of Appeals held that the loss of the bonds constituted a loss on a transaction entered into for profit because the stockholder lent the use of his bonds to protect or enhance the value of his capital stock in the corporation. The Court stated: "* * * the loan of the bonds does not differ from an endorsement by a guarantor who lends his credit to guarantee corporate notes." Ansley v. Commissioner,217 F.2d at 255. Pollak v. Commissioner,209 F.2d 57 (3d Cir. 1954). In Ansley the stockholders anticipated profit from the loan of his bonds was not limited to protecting or increasing the value of his stock, but he was also to receive three percent of the value of his bonds annually as payment for the use of his bonds. With the exception of the $100,000 loan to Command in 1963 none of the subordinated loans by petitioner bore any interest payments. Further, petitioner received all dividends on the securities lent while the securities were in the control of Command. The decision in Pollak, on which Ansley relied, was overruled in Putnam v. Commissioner,352 U.S. 82 (1956). *534 In Putnam, a shareholder, as guarantor, executed a note with the corporation. Subsequently, the shareholder was compelled to satisfy the obligation on the note in his capacity as guarantor. However, the payment by the guarantor shareholder was considered a nonbusiness bad debt and, therefore, not fully deductible as a loss incurred in a transaction entered into for profit as the shareholder contended, but only as a short term capital loss. The Court stated: The loss he sustained when his stock became worthless, as well as the losses from the worthlessness of the loans he made directly to the corporation would receive capital loss treatment; the 1939 Code so provides as to nonbusiness losses both from worthless stock investments and from loans to a corporation, whether or not the loans are evidenced by a security. It is clearly a "fairer reflection" of Putnam's 1948 taxable income to treat the instant loss similarly. There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. * * * [352 U.S. at 92; fn. ref. omitted.] Petitioner argues *535 that the continuing vitality of Ansley is founded in Stahl v. United States,441 F.2d 999 (D.C. Cir. 1970). In Stahl, the taxpayer entered into an agreement with a corporation of which she was not a shareholder whereby she turned her securities over to the corporation to be used by the corporation as part of its capital so that the corporation could satisfy certain SEC requirements. In return the taxpayer received one percent of the value of the securities per quarter, in addition to the dividend and interest income. A subsequent agreement between the taxpayer and the corporation provided that one-half of the securities would be returned to her on December 15, 1963, and the other half to her on September 15, 1964. In October 1963, the corporation sold the securities and declared bankruptcy. In holding that the transaction came within the purview of section 165(c)(2), the Court stated: "insofar as a loan agreement not referable to any existing debt or investment is concerned we think the reasoning of Ansley has merit and survives Putnam * * *." [Emphasis added.] However, the Court went on to state: * * * Putnam bears a broad "economic" *536 reading in situations where the transaction represents financing provided to a corporation by a taxpayer-stockholder to protect his pre-existing investment. In that situation it may be noted, the betterment sought by the taxpayer from the transaction would include increases in value of his investment, which would be taxable when realized only at capital gain rates, and hence there is reason for restriction to capital loss treatment of a transaction that fares badly. * * * [441 F.2d at 1003.] The above-quoted rationale is based on Stratmore v. United States,420 F.2d 461 (3d Cir. 1970), cert. denied 398 U.S. 951 (1970). Stratmore holds that the essence of Putnam is to protect "the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing." The principle set forth in Putnam applies in all cases when a taxpayer holding stock in a corporation has made an undertaking in order to protect or enhance his proprietary interest in a corporation. Stratmore does qualify its position in that a stockholder who is also an officer might justify the debt as *537 related to the business of being an officer, at least when that was a primary motivation. In the instant case, petitioner was not an officer of Command nor did she participate in any decision-making capacity. Stratmore has been followed in United States v. Hoffman,423 F.2d 1217 (9th Cir. 1970). The appeal in the instant case lies in the Ninth Circuit and for that reason, as well as the reasons set forth above, the legal expenses paid which relate to the loans of cash and securities and the recovery thereof do not qualify for treatment under section 165(c)(2). Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Petitioner further contends that the legal expenses incurred from January 20, 1970, to July 12, 1971, which relate to the recovery of the loan of cash and securities are deductible under section 212(1) and (2). Respondent argues that the expenses incurred relate to the cost of acquiring Systems stock pursuant to the reorganization and therefore must be capitalized under section 263. We do not agree with respondent. Petitioner's status as a *538 lender, for purposes of the reorganization, was independent of her status as a shareholder in Command. Respondent relies on a line of cases which stand for the proposition that all expenses, including legal expenses, are not deductible when such expenses are directly related to establishing the ultimate purchase price or sale of a capital asset. Woodward v. Commissioner,397 U.S. 572 (1970); Anchor Coupling Co., Inc. v. United States,427 F.2d 429 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971); Baier v. Commissioner,63 T.C. 513 (1975), affd. 533 F.2d 117 (3d Cir. 1976). However, based on the facts in the instant case, we are convinced that the loans made by petitioner were not considered in determining the purchase price of the Command stock purchased by Systems. Mr. Nex, who participated in the negotiations involving the acquisition of Command stock, testified that Systems was interested in the acquisition of the Command concept and not concerned with the outstanding subordinated loans of petitioner. Mr. Nex further testified that Mr. Benscoter, president of Systems, assured him that obtaining $500,000 *539 as working capital and a line of credit in the amount of $5 million would be no problem. Therefore, that portion of legal expenses which relate to the collection of interest ($10,054.40) on the $100,000 loan made by petitioner in 1963 are currently deductible under section 212(1) due to concessions made by respondent. The remaining issue raises the question of whether the balance of legal expenses paid for recovery of the loans are deductible under the provisions of section 212(2). Petitioner argues that the expenses paid for the recovery of cash and securities were incurred for the management, conservation, or maintenance of property held for the production of income. Petitioners rely on a portion of the regulations which state: Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. [Sec. 1.212-1(k), Income Tax Regs.] It is the position of the petitioner that cash and securities come within the parenthetical *540 section of the above regulation. Respondent argues that under the terms of the regulation, petitioners must demonstrate that their invested property, the cash and securities, must be included in gross income upon recovery. We agree with respondent. Clearly the $100,000 (the principal of the loan in 1963) and the securities recovered pursuant to the second repayment agreement are not includible in petitioner's gross income in the year of recovery. However, the interest accrued on the $100,000 loan would be includible as petitioners indicate on their 1971 joint Federal income tax return. Cf. Spangler v. Commissioner,323 F.2d 913 (9th Cir. 1963). The loan agreements did not provide for any interest payment for the use of the securities lent. All dividends paid on the lent securities were directly transmitted to petitioner. Neither repayment agreement provided for the payment of any interest for the use of the securities pending the actual recovery. The actual return of the lent securities in 1971 was simply that and nothing more. Therefore the provisions of section 212(2) have no application to the expenses incurred in the recovery of the securities. In addition, *541 petitioners argue that the legal expenses incurred for advice regarding the transfer of Walter, Sr.'s ARA Services stock to Command is deductible under section 212(2). Petitioners rely on Bagley v. Commissioner,8 T.C. 130 (1947). However, in Bagley, the taxpayer-shareholder did not make loans to the corporation. She made loans to officers of the corporation who without such loans would have been forced to sell their own shares in the corporation thus flooding the market and depressing the value of the taxpayer's stock. Walter, Sr., was neither an officer nor shareholder of Command. Mr. Donnelly testified that when Walter, Sr., sought advice about transferring his ARA stock to Command he was concerned about a possible conflict of interest as well as possible violations of SEC regulations. Walter, Sr., at the time he sought legal counsel, was an officer of Walston and Co. Moreover, Walter, Sr., made numerous inquiries about his ARA stock and attempted to exercise his control over the use and disposition of it according to the testimony of Mr. Nex. Clearly from the evidence before us, the expenses incurred for advice concerning the transfer of ARA stock to Command *542 were personal in nature and not within the provisions of section 212(2). United States v. Gilmore,372 U.S. 39 (1963). Therefore, the legal expenses paid are deductible under section 212(1) to the extent they apply to the recovery of interest on the $100,000 lent in 1963. Decision will be entered under Rule 155. Footnotes
1. All code section references are to the Internal Revenue Code of 1954.↩
2. The agreement did not provide for any interest payment. All dividends from the borrowed securities were transferred to petitioner by Command.↩
3. Walter, Sr., was not a customer of Command. He never held any stock in Command, and was never an officer of Command.↩
4. As characterized by Mr. Donnelly, petitioner's attorney.↩
5. Mr. Nex advised Mr. Benscoter that if Systems were to implement the Command concept on a nationwide basis an immediate cash loan of $500,000 and a line of credit of $5 million dollars would br required. Mr. Benscoter told Mr. Nex that this would not be a problem and that he would arrange for a loan and a line of credit with the Bank of America.↩
6. Walter, Sr., purchased the ARA Services stock in 1959. His basis in such stock was $1.67 per share. On October 15, 1970, when the stock was to be returned to petitioner, the highest and lowest quoted selling prices for ARA Services were 110-1/2 and 108-1/2. Because of his low basis in this stock, Walter, Sr., was concerned about the extension of the due date to June 30, 1971, and instructed Mr. Nex to not allow the sale of such stock under any circumstances.↩
7. Petitioner concedes that expenses incurred in connection with the loan of $100,000 are not deductible. Respondent concedes that, if we adopt his alternative position, any amounts expended to collect interest are currently deductible under section 212(1). Consequently, respondent's alternative argument is directed to the two loans of securities.↩