Benjamin F. MICHTOM and Hadassah Feil Michtom

v.

The UNITED STATES.

No. 253–76.

United States Court of Claims.

March 22, 1978.

Johnnie M. Walters, Washington, D. C., attorney of record, for plaintiff. Hunton & Williams, Washington, D. C., Ross Arnold, and Arnold & Cate, Atlanta, Ga., of counsel.

Joan Seitz Pate, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge.

This case is before the court on cross motions for summary judgment. The parties have submitted a partial stipulation of facts. The question presented is the proper characterization to be given two losses incurred by the plaintiffs in 1970 and 1974 as a result of entering into a subordination agreement with Hayden Stone Incorporated (hereinafter referred to as Hayden Stone) and subsequently selling preferred stock of H. S. Equities, Inc., Hayden Stone's successor. Having carefully considered the briefs and oral arguments presented, we find that the 1970 loss is properly characterized as an ordinary loss. Due to the parties' failure to stipulate that there was a loss in 1974, we find the assumed [1] 1974 loss to be unripe for summary judgment at this time; so we defer characterizing the assumed 1974 loss until it is factually established that there was a loss.

Benjamin F. and Hadassah Feil Michtom are husband and wife and were husband and wife during 1970 and 1974. Benjamin F. Michtom is a retired industrialist, having retired in 1969. Hadassah Feil Michtom is a housewife and was a housewife during 1970 and 1974.[2] Neither of the plaintiffs were engaged in the business of being a stockbroker, nor had they ever been so engaged.

Over the years Mr. Michtom had accumulated certain securities and bonds. One of the stockbrokerage houses with which he did business was Hayden Stone, in their White Plains, New York, office. At the solicitation of Hayden Stone, Mr. Michtom entered into a subordination agreement with Hayden Stone on April 11, 1968, effective as of April 30, 1968, under which Hayden Stone could utilize the cash and securities in Mr. Michtom's account to satisfy

---

1. We use the adjective "assumed" here because in plaintiffs' 1974 tax return, the briefs before the court, and at oral argument, the parties took that position. There is a serious factual question in our minds whether plaintiffs incurred any loss in 1974. As we will discuss later in the opinion, the existence of a loss in 1974 depends upon the value placed upon the preferred stock which plaintiffs sold in 1974. That value is still in dispute and will have to be established in a subsequent proceeding.

2. Hadassah Feil Michtom is a party to this action only because she filed joint returns with her husband, Benjamin F. Michtom, for the years in question. Hereinafter "Mr. Michtom" will be used in referring to Benjamin F. Michtom and "plaintiffs" will be used when referring to both Benjamin and Hadassah Michtom.

certain S.E.C. and New York Stock Exchange capital requirements. That agreement was replaced by one dated May 6, 1968, effective as of April 30, 1968. The May 6, 1968, agreement merely increased the minimum-maximum amounts Michtom agreed to subordinate from $55,000–$140,000 to $100,000–$200,000. At that time Michtom placed in the subordinated account cash in the amount of $8,962.62 and securities with a market value of approximately $180,000.

As owner of the cash and securities before entering into the subordination transaction, Mr. Michtom could trade the securities at will; he also received the interest and dividends payable on the securities. After April 30, 1968, under the provisions of the agreement, Mr. Michtom could still trade the securities in his account at will. He also still received the interest and dividends payable on the securities in the account. In addition, he received interest credits monthly on the cash in the account at the rate of 6 percent per annum and on the value of the securities at the rate of 2 percent per annum. Beginning October 1, 1969, these rates were increased to 8½ percent and 3 percent respectively.[3]

By entering into the subordination agreement, Mr. Michtom increased his income on the assets in the Hayden Stone account. At the time Mr. Michtom entered the agreement, he was realizing through dividends and interest a rate of return of slightly less than 2 percent on the value of the securities in his account. The agreement with Hayden Stone assured him of more than doubling the rate of return on the account. At the time Mr. Michtom originally entered the subordination agreement, he considered Hayden Stone, one of the largest stockbrokerage firms, reliable and financially sound.

Under the agreement, Mr. Michtom agreed to subordinate any claims which he might have against Hayden Stone with respect to his account to the claims of other creditors of Hayden Stone (who were not subordinated lenders). In the event of a determination by certain officials of Hayden Stone that the subordinated accounts were needed to meet the capital requirements of the S.E.C. or the New York Stock Exchange, or to meet maturing obligations of Hayden Stone, or in the event of insolvency of Hayden Stone, or upon the happening of certain events such as the bankruptcy of Hayden Stone, Hayden Stone could liquidate the securities and use the cash in the account as it determined. If such a liquidation occurred pursuant to the agreement, Mr. Michtom was to have a claim against Hayden Stone in an amount equal to the amount realized by Hayden Stone on the sale or liquidation of the securities, less expenses.

The term of the subordination agreement was indefinite, but the agreement could be terminated by either party by delivery of a written demand. If Mr. Michtom elected to terminate, the agreement ended six months after the end of the month in which the notice was given. If Hayden Stone elected to terminate, the agreement ended two months after the end of the month of such notice.

On April 23, 1970, Michtom notified Hayden Stone of his desire to terminate the agreement and receive back the cash and securities in his account. On July 10, 1970, Hayden Stone notified Michtom that it had sold the securities in all subordinated accounts and that Michtom then had an interest-bearing claim against Hayden Stone for the amount represented by the proceeds from the sale of the securities, less expenses, in the amount of $112,774.04. The amount of the interest-bearing claim ultimately rose to $127,764.55.

In the summer of 1970 Hayden Stone found itself in an impossible financial position. Because of its difficult financial position, Hayden Stone negotiated the sale of most of its business operations and the name "Hayden Stone" to Cogan, Berlind, Weill & Levitt, Inc., another stockbrokerage

---

3. Hereinafter the interest earned under the subordination agreement will be referred to as "subordination interest" to distinguish it from the interest earned on the securities owned by Mr. Michtom.

firm.[4] To consummate the proposed transaction, however, it was necessary to obtain the agreement of 108 subordinated lenders to withhold exercise of any claims until such time as Hayden Stone arranged for payment of all public customers and, further, to subordinate their claims to that of Cogan, Berlind, Weill & Levitt, Inc. Consequently, Hayden Stone, together with the "Committee of Subordinated Lenders," recommended that all subordinated lenders agree to the proposed transaction with Cogan, Berlind, Weill & Levitt, Inc., to withhold exercising their claims and, further, to accept one share of $6 Senior Preferred Stock in H. S. Equities, Inc., for each $100 aggregate principal amount of all outstanding indebtedness of the corporation to the undersigned as a subordinated lender to the corporation in exchange for and in lieu of all the claims of the undersigned against the corporation. Pursuant to this arrangement, Michtom signed the agreement and consent and exchanged his claim against Hayden Stone for 1,277.65 shares of the $6 Senior Preferred Stock. Michtom held the preferred stock until 1974 when he sold his shares to an unrelated party for $2,500 cash.

On their 1970 joint federal income tax return, plaintiffs claimed an ordinary loss deduction for the difference between Mr. Michtom's tax basis for the securities in his subordinated account and the fair market value of the preferred stock of H. S. Equities, Inc., he received in exchange for claims against Hayden Stone. On audit of that return, the Internal Revenue Service disallowed the ordinary loss deduction, contending that the loss was a capital loss with only $1,000 deductible against ordinary income in 1970. As a result, the Internal Revenue Service issued a deficiency notice for additional income tax due, interest, and penalty. Plaintiffs paid the amounts assessed and filed a timely claim for refund.

On their 1974 joint federal income tax return, plaintiffs claimed a long-term capital loss for the difference between the $2,500 cash received upon the sale of the 1,277.65 shares of $6 Senior Preferred Stock in H. S. Equities and the value of the preferred stock shown on the 1970 return. The plaintiffs later claimed that this loss was ordinary rather than capital and, accordingly, filed a timely claim for refund for overpayment of their 1974 income taxes.

Six months passed and the Internal Revenue Service failed to act upon either of the refund claims. Therefore, plaintiffs filed this suit seeking refund.

The parties agree that the subordination agreement involved herein was a transaction entered into for profit. They also agree that plaintiffs realized a loss in calendar year 1970 as a result of entering into the subordination agreement.[5] The parties differ upon how the 1970 loss should be treated under the tax code. Plaintiffs maintain that the 1970 loss is deductible as an ordinary loss under Internal Revenue Code[6] § 165(a) and (c)(2). Defendant contends that, although the 1970 loss is deductible under I.R.C. § 165(a) and (c)(2), the amount of the deduction is further limited by I.R.C. § 165(f) because the 1970 loss is a capital loss.[7] Alternatively, defendant con-

---

4. This was really the first step in the eventual liquidation of Hayden Stone.

5. The parties do not agree what the total loss in 1970 was; however, they stipulated it was at least $30,000. The amount of the 1970 loss depends upon the value of the H. S. Equities, Inc., preferred stock which Mr. Michtom received in September 1970.

6. Hereinafter all Internal Revenue Code sections will be cited I.R.C. and will be to the 1954 Code as amended, unless otherwise stated.

7. The pertinent portions of I.R.C. § 165 are:

"Sec. 165 [1954 Code]. (a) General rule.— There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

"(c) Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \*

"(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

\* \* \* \* \* \*

"(f) Capital losses.—Losses from sales or exchanges of capital assets shall be allowed only

tends the 1970 loss should be deducted as a bad debt under I.R.C. § 166. If that is done, the amount deductible by plaintiff is again limited by the limitations placed upon the deduction of capital losses, I.R.C. §§ 1211(b) and 1212, because I.R.C. § 166(d) is applicable to the 1970 loss for it is a nonbusiness bad debt.[8]

Both parties argued this case assuming that plaintiffs had incurred a loss in calendar year 1974.[9] They agree that if there was such a loss, it is deductible under I.R.C. § 165(a) and (c)(2). Defendant again contends, however, that the amount of the 1974 loss deduction is limited by I.R.C. § 165(f) because the 1974 loss is a capital loss.

The 1970 loss raises several issues for our consideration. We must determine whether the 1970 loss is deductible under section 165 or section 166. Should it be deductible under section 166, we must then determine whether section 166(d) is applicable to convert the 1970 loss into a capital loss. If section 165 is held to be the applicable de-

duction section, then we must determine whether the 1970 loss is properly characterized as a capital loss or an ordinary loss.

■ We turn first to the issue of whether the 1970 loss is properly deductible under section 165 or section 166. We find the recent decision of the District of Columbia Circuit Court of Appeals in *Stahl v. United States*, 142 U.S.App.D.C. 309, 441 F.2d 999 (1970), helpful on this issue. The essential facts of *Stahl* are identical to the facts of this case.[10] The Government's contention in *Stahl* was that the taxpayer's loss was deductible under section 166 and not section 165. Judge Leventhal, after thoroughly reviewing the applicability of section 166, held that it was not applicable because no bona fide debt was ever created under the terms of the subordination agreement.[11] We agree with not only the decision but the rationale of the Circuit Court of Appeals in *Stahl*. Therefore, we hold section 165 is the governing deduction provision in this case. Since defendant made the same contention

to the extent allowed in sections 1211 and 1212."

**8.** The pertinent portions of I.R.C. § 166 are "Sec. 166 [1954 Code]. (a) General rule.—
"(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
"(2) Partially worthless debts.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

\* \* \* \* \* \*

"(d) Nonbusiness debts.—
"(1) General rule.—In the case of a taxpayer other than a corporation—
"(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
"(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
"(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—
"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

**9.** See footnote 1.

**10.** The facts in *Stahl* showed that
"On April 12, 1962, Mrs. Ruby Smith Stahl, a widowed musician and music teacher, turned securities with a market value of approximately $210,000 over to Balogh & Co., a Washington securities firm. Under an agreement between Mrs. Stahl and the firm, the securities were to be used by the firm as part of its capital so that the firm could satisfy certain SEC requirements. The securities were to be returned to her on May 12, 1963, subject, however, to the claims of all of the firm's creditors, present and future. In return Mrs. Stahl received one percent of the value of the securities per quarter, in addition to the dividend and interest income. \* \* \*

\* \* \* \* \* \*

A subsequent agreement between the taxpayer and the firm provided that one half of the securities would be returned to her on December 15, 1963, and the other half on September 15, 1964. On October 31, 1963, however, the firm sold the securities for $257,078.90. In August, 1964, the firm filed a petition in bankruptcy." \* \* \* [142 U.S.App.D.C. at 309, 441 F.2d at 999–1000.]

**11.** Treas.Reg. 1.166–1(c) (1959) sets forth the requirement that a bona fide debt must exist before section 166 entitles a taxpayer to a deduction.

in *Stahl* on this issue as in this case, we deem further elaboration of the rationale for our holding unnecessary in view of Judge Leventhal's well-reasoned opinion in *Stahl.*

■■■■ Since we find I.R.C. § 165(a) and (c)(2) to be the governing deduction provision, we must next determine whether Mr. Michtom's 1970 loss is properly characterized a capital loss or an ordinary loss. Losses and gains are characterized by examining the substance of the transaction from which they arose. See *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955); *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Commissioner v. Gillette Motor Transport Inc.*, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); *Commissioner v. Ferrer*, 304 F.2d 125 (1962); *Norton v. United States*, 551 F.2d 821, 213 Ct.Cl. 215 (1977), cert. denied, 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977). If the transaction is a capital transaction, then the loss resulting therefrom is a capital loss and deductible under I.R.C. § 165(a) and (c)(2) only to the extent allowed by I.R.C. § 165(f). If the transaction is not a capital transaction, then the loss resulting therefrom is an ordinary loss and deductible under I.R.C. § 165(a) and (c)(2) without further limitation. For a transaction to be classified a capital transaction, it must involve the "sale or exchange" of a "capital asset." 3B Mertens, *Law of Federal Income Taxation*, § 22.01 (Malone Rev. 1973). A sale has been defined as a "transfer of property for a fixed price in money or its equivalent." *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965). An exchange is defined in the regulations as a "reciprocal transfer of property as distinguished from the transfer of property for money consideration only." Treas.Reg. § 1.1002–1(d) (1957). I.R.C. § 1221 defines the term "capital asset":

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—[five (now six) categories of property which are not pertinent in this case]

Mr. Michtom incurred the 1970 loss by reason of the subordination agreement wherein he authorized Hayden Stone, upon the occurrence of certain events, to liquidate the securities in his account and apply the proceeds to satisfy Hayden Stone's general creditors. There is no dispute that this authorization caused the loss. Mr. Michtom realized the 1970 loss for tax purposes when he consented to give up all claims he had against Hayden Stone under the terms of the subordination agreement for the 1,277.-65 shares of $6 Senior Preferred Stock in H. S. Equities, Inc., Hayden Stone's successor.[12] To properly characterize the 1970 loss as capital or ordinary, we must determine whether the subordination agreement rights which Mr. Michtom had are a capital asset.

Contract rights constitute property in a property law sense. Thus, the contract rights which Mr. Michtom gave up in September 1970 fall within the literal definition of a capital asset. I.R.C. § 1221, *supra.* The Supreme Court has held, however, that not all property is property for purposes of the capital gains provisions. *Commissioner v. P. G. Lake, Inc., supra*, at 264, 78 S.Ct. 691; *Commissioner v. Gillette Motor Transport, Inc., supra*, at 133, 80 S.Ct. 1497; *Commissioner v. Ferrer, supra*, at 129. In so holding, the Supreme Court has stated:

While a capital asset is defined in [§ 1221] as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense * * * is * * * a capital asset. This Court has long held that

12. There is a potential question whether this literal exchange of contract rights for preferred stock is a "sale or exchange" for tax purposes. *See Fairbanks v. United States*, 306 U.S. 436, 159 S.Ct. 607, 83 L.Ed. 855 (1939); Eustice, *Contract Rights, Capital Gain, and Assignment*

*of Income—The Ferrer Case*, 20 Tax.L.Rev. 1, 3, and cases cited in footnote 12 (1964). The plaintiff did not raise this issue, however. Nor do we for we find the capital asset issue dispositive as to the treatment of the 1970 loss.

the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. *Burnet v. Harmel*, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. * * * [*Commissioner v. Gillette Motor Transport, Inc., supra*, at 134, 80 S.Ct. at 1500.] [*See also Corn Products Refining Co. v. Commissioner, supra*, at 52, 76 S.Ct. 20.[13]]

■ We believe the pronouncements of the Supreme Court, in construing the capital gains provisions, have equal weight regardless whether a gain or loss is involved. For us to hold otherwise would in effect give the term "capital asset" two meanings, one when a loss is involved and another when a gain is present. We discern no basis for such an interpretation of I.R.C. § 1221.

■ With the language of the Supreme Court firmly in mind, we have carefully reviewed the subordination agreement rights which Mr. Michtom had in September 1970. It is our holding that those contract rights were not a capital asset for they lacked an essential characteristic of capital assets—the ability to appreciate or depreciate in value over a period of time.[14] *Commissioner v. Gillette Motor Transport, Inc., supra*, at 134, 80 S.Ct. 1497; Eustice, *Contract Rights, Capital Gain, and Assignment of Income—The Ferrer Case, supra* note 12, at 4. It follows that, since the contract rights Mr. Michtom exchanged for the preferred stock were not a capital asset, the

1970 loss did not result from a capital transaction and therefore the limitation on capital loss deductions does not apply to plaintiffs' 1970 loss. At the same time, there is no dispute that plaintiffs' 1970 loss was caused by the subordination agreement in which Mr. Michtom assumed the risk that, upon the occurrence of certain events, Hayden Stone could liquidate the securities in the subordinated account and use the proceeds to satisfy its general creditors. Nor is there a dispute that the subordination agreement was a transaction entered into for profit. Therefore, we hold the plaintiffs are entitled to an ordinary loss deduction for the loss Mr. Michtom realized in September 1970.

■ The parties have also made cross motions for summary judgment on the issue of the proper characterization of the loss Mr. Michtom realized when he sold his H. S. Equities, Inc., stock in 1974 for $2,500. We find it premature for us to entertain a motion for summary judgment on this issue now. Presently, the parties are in a genuine dispute over the amount of loss Mr. Michtom realized in both 1970 and 1974. This dispute will not be resolved until the parties agree to stipulate what the value of the 1,277.65 shares of $6 Senior Preferred Stock of H. S. Equities, Inc., is or the value is determined in a proceeding before a trial judge. Until that value is determined, we feel there is a big question whether Mr. Michtom incurred a loss in 1974 at all. In fact, is is quite possible that in a proceeding before a trial judge, it will be established that either Mr. Michtom incurred no loss in the 1974 sale, because the value of the preferred stock was $2,500 in September

13. Plaintiffs raise the *Corn Products* doctrine which originated in this decision in endeavoring to have the 1970 loss characterized as an ordinary loss. We reject their argument for the *Corn Products* doctrine is limited in application to cases where the taxpayer is involved in a trade or business activity. *See Corn Products Refining Co. v. Commissioner, supra; Booth Newspapers, Inc. v. United States*, 303 F.2d 916, 157 Ct.Cl. 886 (1962); *Carsello v. Commissioner*, 35 T.C.M. 832 (1976); and cases summarized in *Southeastern Aviation Underwriters, Inc. v. Commissioner*, 25 T.C.M. 412

(1966). Plaintiffs stipulated they were not engaged in the trade or business of being a stockbroker but were merely investors.

14. The only right which Mr. Michtom obtained under the subordination agreement, which he did not previously have as an owner of securities, was the right to receive subordination interest. The value of this right was fixed by the parties to the agreement and could not vary as the value of a capital asset can. For example, the value of an art object can go up or down depending upon the market forces.

1970, or that he actually realized a gain, because the value of the preferred stock was less than $2,500 in September 1970. For us to undertake the task of characterizing the 1974 loss when the facts are indefinite would be equivalent to our issuing an advisory opinion. For obvious reasons, it would be premature for us to so act and we decline to do so.

## CONCLUSION

Accordingly, we hold that plaintiffs' 1970 loss is properly deductible as an ordinary loss and we grant plaintiffs partial summary judgment on that issue. Defendant's motion for summary judgment regarding the 1970 loss is denied. Due to the premature nature of both motions for summary judgment regarding the correct characterization of the 1974 loss (or gain), we deny both motions, without prejudice, on that issue. We send the case to the trial division, pursuant to Rule 131(c), for determination of the value of the 1,277.65 shares of $6 Senior Preferred Stock of H. S. Equities, Inc., the amount of loss plaintiffs realized in 1970, the amount of loss (or gain) plaintiffs realized in 1974, and the amount of refund the plaintiffs are entitled to receive, if any. If the trial judge finds that plaintiffs realized a loss (or gain) in 1974, a recommended opinion on the issue of the proper characterization of the loss (or gain) will also be in order.