Benjamin F. MICHTOM and
Hadassah Feil Michtom

v.

The UNITED STATES.

No. 253–76.

United States Court of Claims.

July 2, 1980.

Johnnie M. Walters, Washington, D.C., attorney of record, for plaintiffs; Ross Arnold, Atlanta, Ga., of counsel.

Donald H. Olson, Washington, D.C., with whom was Asst. Atty. Gen., M. Carr Ferguson, for defendant; Theodore D. Peyser, Jr., and Ellen C. Specker, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and DAVIS, NICHOLS, KASHIWA, BENNETT and SMITH, Judges, en banc.

## OPINION

DAVIS, Judge:

This personal income tax case (which comes before us on a stipulation of facts) centers on the proper characterization and amount of losses plaintiffs incurred in 1970 and 1974. In a previous opinion in the case, a panel of the court ruled that the 1970 loss should be characterized as an ordinary loss fully deductible under I.R.C. § 165(c)(2).

*Michtom v. United States*, 216 Ct.Cl. ——, 573 F.2d 58 (1978). On application by the Government, we agreed that the full court would now hear argument to allow for possible reconsideration of our previous opinion.[1] The court en banc concludes that both the 1970 and 1974 losses should be characterized as capital losses deductible only to the extent allowed by I.R.C. § 165(f). We therefore hold for the Government and vacate the panel decision.

The main facts necessary for our decision are set forth in our prior opinion, *Michtom, supra*, 216 Ct.Cl. at ——, 573 F.2d at 59–61, and for convenience we repeat them here:[2]

"Benjamin F. and Hadassah Feil Michtom are husband and wife and were husband and wife during 1970 and 1974. Benjamin F. Michtom is a retired industrialist, having retired in 1969. Hadassah Feil Michtom is a housewife and was a housewife during 1970 and 1974.[3] Neither of the plaintiffs were engaged in the business of being a stockbroker, nor had they ever been so engaged.

"Over the years Mr. Michtom had accumulated certain securities and bonds. One of the stockbrokerage houses with which he did business was Hayden Stone, in their White Plains, New York, office. At the solicitation of Hayden Stone, Mr. Michtom entered into a subordination agreement with Hayden Stone on April 11, 1968, effective as of April 30, 1968, under which Hayden Stone could utilize the cash and securities in Mr. Michtom's account to satisfy certain S.E.C. and New York Stock Exchange capital requirements. That agreement was replaced by one dated May 6, 1968, effective as of April 30, 1968. The May 6, 1968, agreement merely increased the minimum-maximum amounts Michtom agreed to subordinate from $55,000–$140,000 to $100,000–$200,000. At that time Michtom placed in the subordinated account cash in the amount of $8,962.62 and securities with a market value of approximately $180,000.

"As owner of the cash and securities before entering into the subordination transaction. Mr. Michtom could trade the securities at will; he also received the interest and dividends payable on the securities. After April 30, 1968, under the provisions of the agreement, Mr. Michtom could still trade the securities in his account at will. He also still received the interest and dividends payable on the securities in the account. In addition, he received interest credits monthly on the cash in the account at the rate of 6 percent per annum and on the value of the securities at the rate of 2 percent per annum. Beginning October 1, 1969, these rates were increased to 8½ percent and 3 percent respectively.[4]

"By entering into the subordination agreement, Mr. Michtom increased his income on the assets in the Hayden Stone account. At the time Mr. Michtom entered the agreement, he was realizing through dividends and interest a rate of return of slightly less than 2 percent on

1. The procedural history of this case is somewhat unusual. The case originally came before the court on cross-motions for summary judgment based on a partial stipulation of fact. The court granted plaintiff partial summary judgment and remanded the case to the trial judge for certain findings of fact and a recommended opinion on the proper characterization of any loss realized in 1974. The parties, however, chose to forego trial and entered into a further stipulation which they believe contains all the facts necessary to a decision of both the liability and the quantum issues. The case was reported to us, on that basis, for final determination. Thus, the case is back before us without the benefit of trial judge's findings or recommended opinion.

2. Other relevant facts are also stated elsewhere in this opinion.

3. "Hadassah Feil Michtom is a party to this action only because she filed joint returns with her husband, Benjamin F. Michtom, for the years in question. Hereinafter Mr. Michtom will be used in referring to Benjamin F. Michtom and plaintiffs will be used when referring to both Benjamin and Hadassah Michtom."

4. "Hereinafter the interest earned under the subordination agreement will be referred to as subordination interest to distinguish it from the interest earned on the securities owned by Mr. Michtom."

the value of the securities in his account. The agreement with Hayden Stone assured him of more than doubling the rate of return on the account. At the time Mr. Michtom originally entered the subordination agreement, he considered Hayden Stone, one of the largest stockbrokerage firms, reliable and financially sound.

"Under the agreement, Mr. Michtom agreed to subordinate any claims which he might have against Hayden Stone with respect to his account to the claims of other creditors of Hayden Stone (who were not subordinated lenders). In the event of a determination by certain officials of Hayden Stone that the subordinated accounts were needed to meet the capital requirements of the S.E.C. or the New York Stock Exchange, or to meet maturing obligations of Hayden Stone, or in the event of insolvency of Hayden Stone, or upon the happening of certain events such as the bankruptcy of Hayden Stone, Hayden Stone could liquidate the securities and use the cash in the account as it determined. If such a liquidation occurred pursuant to the agreement, Mr. Michtom was to have a claim against Hayden Stone in an amount equal to the amount realized by Hayden Stone on the sale or liquidation of the securities, less expenses.

"The term of the subordination agreement was indefinite, but the agreement could be terminated by either party by delivery of a written demand. If Mr. Michtom elected to terminate, the agreement ended six months after the end of the month in which the notice was given. If Hayden Stone elected to terminate, the agreement ended two months after the end of the month of such notice.

"On April 23, 1970, Michtom notified Hayden Stone of his desire to terminate the agreement and receive back the cash and securities in his account. On July 10, 1970, Hayden Stone notified Michtom that it had sold the securities in all subordinated accounts and that Michtom then had an interest-bearing claim against

Hayden Stone for the amount represented by the proceeds from the sale of the securities, less expenses, in the amount of $112,774.04. The amount of the interest-bearing claim ultimately rose to $127,764.55.

"In the summer of 1970 Hayden Stone found itself in an impossible financial position. Because of its difficult financial position, Hayden Stone negotiated the sale of most of its business operations and the name Hayden Stone to Cogan, Berlind, Weill & Levitt, Inc., another stockbrokerage firm.[5] To consummate the proposed transaction, however, it was necessary to obtain the agreement of 108 subordinated lenders to withhold exercise of any claims until such time as Hayden Stone arranged for payment of all public customers and, further, to subordinate their claims to that of Cogan, Berlind, Weill & Levitt, Inc. Consequently, Hayden Stone, together with the Committee of Subordinated Lenders, recommended that all subordinated lenders agree to the proposed transaction with Cogan, Berlind, Weill & Levitt, Inc., to withhold exercising their claims and, further, to accept one share of $6 Senior Preferred Stock in H. S. Equities, Inc., for each $100 aggregate principal amount of all outstanding indebtedness of the corporation to the undersigned as a subordinated lender to the corporation in exchange for and in lieu of all the claims of the undersigned against the corporation. Pursuant to this arrangement, Michtom signed the agreement and consent and exchanged his claim against Hayden Stone for 1,277.65 shares of the $6 Senior Preferred Stock. Michtom held the preferred stock until 1974 when he sold his shares to an unrelated party for $2,500 cash.

"On their 1970 joint federal income tax return, plaintiffs claimed an ordinary loss deduction for the difference between Mr. Michtom's tax basis for the securities in his subordinated account and the fair market value of the preferred stock of H. S. Equities, Inc., he received in exchange

5. "This was really the first step in the eventual liquidation of Hayden Stone."

for claims against Hayden Stone. On audit of that return, the Internal Revenue Service disallowed the ordinary loss deduction, contending that the loss was a capital loss with only $1,000 deductible against ordinary income in 1970. As a result, the Internal Revenue Service issued a deficiency notice for additional income tax due, interest, and penalty. Plaintiffs paid the amounts assessed and filed a timely claim for refund."

"On their 1974 joint federal income tax return, plaintiffs claimed a long-term capital loss for the difference between the $2,500 cash received upon the sale of the 1,277.65 shares of $6 Senior Preferred Stock in H. S. Equities and the value of the preferred stock shown on the 1970 return. The plaintiffs later claimed that this loss was ordinary rather than capital and, accordingly, filed a timely claim for refund for overpayment of their 1974 income taxes."

When Mr. Michtom exchanged his subordination agreement rights for the preferred stock in 1970, Hayden Stone had 108 subordinated lenders under a number of different agreements. After our prior *Michtom* ruling, the Tax Court and the Second Circuit considered a suit brought by other subordinated lenders and reached a result different from the one plaintiff says is mandated by the law and our previous opinion. *Lorch v. Commissioner,* 70 T.C. 674 (1978), *affirmed,* 605 F.2d 657 (2d Cir. 1979), *cert. denied,* 444 U.S. 1076, 100 S.Ct. 1024–25, 62 L.Ed.2d 759 (1980). Defendant argues that *Lorch* raises serious questions about the approach we earlier followed here.[6] Plaintiff

contends that reconsideration of our previous decision would bring us into direct conflict with the District of Columbia Circuit's holding in *Stahl v. United States,* 142 U.S. App.D.C. 309, 441 F.2d 999 (1970). We first explore those separate propositions, and then take up directly the question of the characterization of plaintiffs' losses in 1970 and 1974.

## I

In *Stahl*[7] the Government argued that the taxpayer's loss was a nonbusiness bad debt deductible under I.R.C. § 166(d) as a short term capital loss. It contended that (1) a debt was created by implication when the taxpayer deposited the securities with the broker, or, alternatively, (2) a debt was created when the broker sold the securities. Judge Leventhal, writing for the court, held that no debtor-creditor relationship ever existed because Mrs. Stahl's agreement with the broker did not provide for the payment of money, but for the return of the securities deposited. *Stahl, supra,* 142 U.S.App. D.C. at 312, 441 F.2d at 1002. Taxpayer's loss was suffered when her securities were sold, *id.* at 313, 441 F.2d at 1003, because the broker could then no longer return them, *in kind,* as the parties intended. Mrs. Stahl's rights against the broker were not to receive payment of the proceeds of sale, but to bring suit for breach of the promise to return the securities. Her recovery from the bankrupt broker reduced the amount of the loss she had previously realized.

In our earlier opinion we said we agreed with both the rationale and holding in

6. The Government's position on *Lorch* is, at best, confusing. In its brief to us, the Government states that *Lorch* involves "nearly identical facts" and "in most material respects is squarely contrary to this Court's earlier opinion." Yet in its later memorandum filed with the Supreme Court of the United States opposing the request of the taxpayers in *Lorch* for a writ of certiorari the Government argued that Mr. Lorch's agreement with Hayden Stone "differed significantly" from Mr. Michtom's agreement, and that "the decision in the instant case [*Lorch*] that petitioners were not entitled to deductible losses *does not conflict with Michtom* because petitioners' losses arose from

the sale of securities—which were undeniably capital assets—and from the exchange of rights to receive debentures for preferred stock." (emphasis added).

7. For a summary of the facts in *Stahl,* see *Michtom, supra,* 216 Ct.Cl. at ——, 573 F.2d at 62, n.10. In our first opinion, *id.* at ——, 573 F.2d at 62, we said that the essential facts of *Stahl* were identical to the facts in this case. As explained *infra,* we now believe that there are significant factual distinctions which support our reaching a different result from that in *Stahl* without rejecting *Stahl's* underlying reasoning.

*Stahl.*[8] We have no occasion to renounce or reconsider that stance. But we do not concur with plaintiffs that acceptance of the *Stahl* rationale requires that we reach a similar result in this case. There the court held that the agreement did not create a debtor-creditor relationship when the stock was transferred to the broker; the court also held that no debtor-creditor relationship was formed when the stock was sold. In our case, unlike *Stahl*, the subordination agreement does allow for the sale of the securities and does create a claim for the proceeds in the plaintiffs' favor. This is significantly different from the taxpayer's right in *Stahl* to return of the securities themselves. Because the Government has dropped its contention that the 1970 loss is properly deductible under I.R.C. § 166, we need not decide whether what Mr. Michtom received on the sale of his stock by Hayden Stone is properly characterized as a debt.

Because of the difference in facts we have just pointed out and the Government's stress there on the bad-debt contention, the *Stahl* court was not presented with the central issue in the present case. That taxpayer's loss was realized when her securities were sold by the broker. In our case, the subordination agreement specifically contemplated sale of the securities and substitution of an interest-bearing claim payable in one year. Mr. Michtom realized no loss when his stock was sold by Hayden Stone and his claim to the proceeds was credited to him.[9] Moreover, there was no sale or exchange in *Stahl*; that taxpayer's recovery was through the bankruptcy proceeding, presumably based on her breach of contract claim. Mr. Michtom, on the other hand, chose (later in 1970) to transfer the rights he retained under the subordination agreement for the preferred stock. If Mr. Michtom had waited the year and failed to collect on his claim, rather than exchanging it, we would be presented with a different case. We are not now confronted, however, with a failure to collect under the subordination agreement, but with a loss resulting from a sale or exchange of an asset. On that issue, *Stahl* is not in point.

## II

Nor are we convinced that the actual holding in *Lorch, supra,* is dispositive of the issue before us. As the Government has itself conceded (see note 6, *supra*), the *Lorch* agreement is different from that in the instant case. The stocks there involved were collateral for a promissory note. Prior to the sale of the securities the taxpayer had notice and an opportunity to substitute other securities or cash for the securities in the subordination account. Their agreement provided that the taxpayers in *Lorch* would receive a 6-percent subordinated debenture in the principal amount equal to the amount paid on the indebtedness represented by the note. Here, there was no promissory note, no notice or right of substitution prior to sale of the securities, and no right to debentures.[10]

In addition, the *Lorch* sale of those taxpayers' securities by Hayden Stone produced a *loss*, while in this case the proceeds of the sale by Hayden Stone exceeded Mr. Michtom's basis, thus leading to a *gain*. The character of Mr. Michtom's loss in 1970 (on exchange of his claim against Hayden Stone for the preferred stock of H. S. Equities, Inc.) is not necessarily dependent on the character of his gain from the earlier sale of the securities by Hayden Stone. Thus, our failure to discuss this earlier transaction separately does not indicate, as the Tax Court may have assumed (70 T.C. at 683), that we believed a loss on the sale of the securities by Hayden Stone should be treated as an ordinary loss arising from the subordination agreement itself. That issue

---

**8.** At that first stage of the present case, one of the defendant's main arguments was that *Stahl* was wrong and should not be followed at all. That contention is no longer made.

**9.** In fact, Mr. Michtom made a small gain. See Part II, *infra.*

**10.** The Second circuit, in discussing our previous opinion, appeared to be under the impression that our case involved debentures or rights to debentures. *See Lorch, supra,* 605 F.2d at 660, n.5.

was not and is not present on the facts of this case.[11] Similarly, there is no issue here concerning tax free recapitalizations under I.R.C. § 368(a)(1)(E). In sum, the precise holding in *Lorch* that those taxpayers suffered a capital loss on the sale of their stock and no loss on the exchange of their rights to debentures for preferred stock is of limited relevance to the different facts with which we are confronted.[12]

## III

We are left, then, with the same issue with which the panel wrestled in its earlier opinion—was the transfer in 1970 of Mr. Michtom's monetary claim against Hayden Stone under the subordination agreement for the preferred stock a sale or exchange of a capital asset under the Internal Revenue Code?[13] The prior opinion held that a capital asset was not involved. The *Lorch* opinions of the Tax Court (70 T.C. at 683–84, n.11) and the Second Circuit (605 F.2d at 660, n.5) both questioned that holding by way of reasoned dicta, and defendant now relies on those statements.

Mr. Michtom's monetary claim against Hayden stone under the subordination agreement was doubtless "property" in the ordinary legal sense,[14] and did not fall within any of the six specific categories of property excluded by I.R.C. § 1221 from the definition of a capital asset. Nor does the judicially-announced principle of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed.2d 29 (1955) and *Commissioner v. Gillette Motor Transport*, 364 U.S. 130, 134–35, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960), dictate another conclusion in this instance. Plaintiffs have not shown that the substance of Mr. Michtom's

exchange of the claim for the preferred stock differed from the typical capital or investment transaction. They emphasize that the exchange transaction was "entered into for profit," but surely that does not distinguish it from other characteristic capital investments. They also argue that all of Mr. Michtom's transactions almost inevitably resulted from the original entry into the subordination agreement. We disagree. The exchange here, subordination agreement rights for preferred stock, took place outside the subordination agreement, and was not initially contemplated by the parties to that agreement. Mr. Michtom made a painful but not a typical investment decision—to accept something of value in the present, rather than risk receiving nothing in the future. The only thing the subordination agreement compelled Mr. Michtom to do was to allow Hayden Stone to sell his securities and substitute for the proceeds an interest-bearing claim payable in a year. As we have said, Mr. Michtom realized no loss on that transaction. His loss arose from his own later decision to exchange one asset for another.

The panel opinion accepted that characterization of the subordination agreement rights as not a capital asset because, it thought, that those rights lacked the ability to appreciate or depreciate in value over a period of time. 216 Ct.Cl. at ——, 573 F.2d at 64. This position was particularly criticized in the *Lorch* opinions,[15] and the court *en banc* now agrees that it was incorrect. We pass over the question of whether such a characteristic is a necessary requirement for all capital assets because we believe that the asset here did possess that quality.

---

**11.** The Tax Court may have been unaware that the sale of Mr. Michtom's securities involved a gain, not a loss. That court pointed out that in *Stahl* the sale of the taxpayer's securities resulted in a gain, not a loss, and that no debentures were involved. *Lorch, supra*, 70 T.C. at 682–83. In this regard, the facts in the present case are identical to those in *Stahl*.

**12.** There are, however, statements and dicta in the *Lorch* opinions of the Tax Court and the Second Circuit which are helpful in our consideration of the present case. *See* Part III, *infra*.

**13.** Taxpayers have not claimed that the transfer failed to constitute a sale or exchange (*see Michtom, supra*, 216 Ct.Cl. at ——, 573 F.2d at 63, n.12), and we do not go into that problem.

**14.** I.R.C. § 1221 defines capital assets as all "property" except for specified exceptions.

**15.** Though it should be noted that the Second Circuit thought that our case involved debentures or rights to debentures. See note 10, *supra*.

If one considers the "rights" under the subordination agreement to be limited to the interest paid on the value of the account, then it might be said that there would be relatively little fluctuation in value. Here, however, the rights under the subordination agreement, after the securities were sold by Hayden Stone, consisted of the right to receive payment on an interest-bearing claim in one year. This claim was subordinated to the rights of general creditors to demand payment. Clearly, the value of the subordination agreement rights would fluctuate depending on the financial condition of Hayden Stone. The reasonable belief that, despite its face value, the claim might be worthless at maturity was the apparent motivation for the exchange.[16]

So viewed, Mr. Michtom's transfer of his subordination agreement rights for the preferred stock was an exchange of a capital asset. Any loss deduction is limited by the terms of I.R.C. § 165(f).

## IV

■ We need discuss only briefly plaintiffs' arguments concerning the 1974 loss. They premise their contention that the loss on the sale of the preferred stock in 1974 should be characterized as ordinary on the theory that the sale was an integral part of the original subordination agreement transaction.[17] We cannot accept that premise. The subordination agreement transaction ended in 1970 when Mr. Michtom exchanged his rights under that agreement for the preferred stock. By his own choice, he held that stock (which had a value of $35 per share in 1970) for four years, then sold it at a loss. That transaction was clearly the sale of a typical capital asset and any loss deduction is likewise limited by the terms of section 165(f). See also Part III, *supra*.

## CONCLUSION

For the foregoing reasons, we conclude that plaintiffs' losses in 1970 and 1974 should be characterized as capital. Plaintiffs are therefore not entitled to recover and the prior panel decision is vacated. The petition is dismissed.

KASHIWA, Judge, with whom SMITH, Judge, joins, dissenting:

I dissent on the following grounds.

In the first *Michtom* opinion, we held that "the *essential* facts . . . are identical to the facts [in *Stahl v. United States*, 441 F.2d 999 (1970)]." [Emphasis supplied.] 216 Ct.Cl. ——, ——, 573 F.2d 58, 62 (1978). Accordingly, we adopted the rationale of *Stahl* and held the case was resolved by section 165, not section 166. 216 Ct.Cl. at ——, 573 F.2d at 62. The majority errs by attempting to distinguish *Stahl* on an oversimplified basis.

The basis for distinction seized by the majority is the assertion that:

* * * In our case, unlike *Stahl*, the subordination agreement does allow for the sale of the securities and does create a claim for the proceeds in the plaintiffs' favor. This is significantly different from the taxpayer's right in *Stahl to return of the securities themselves.* * * [Emphasis supplied.]

The majority thus limits the contractual obligation in *Stahl* solely to the return of the securities. However, that is not the case.

The majority's analysis of the *Stahl* facts overlooks two very important paragraphs in Mrs. Stahl's subordination agreement with her broker, which were considered in the first *Michtom* opinion. Such paragraphs are: (1) Paragraph 2, which provided that Mrs. Stahl agreed to subordinate to the claims of all present and future creditors of Balough & Company (her broker) her right to demand the return of the securities *or to receive payment for them* (294 F.Supp. 243 (1969)), and (2) Paragraph 8, which provided

16. The parties have stipulated that at the time of the exchange in 1970 the preferred shares had a value of $35 per share. Michtom received 1,277.65 shares.

17. They rely principally on *Arrowsmith v. Commissioner*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952), which involved entirely different facts.

that "the securities loaned to Balough pursuant to this instrument may be used and dealt with by Balough as part of its capital *and shall be subject to the risks of Balough's business.*" [Emphasis supplied.] *Id.* Furthermore, even Judge Leventhal specifically found:

> * * * What is more fairly intended to be conveyed [rather than free dominion of sale] was the power to sell upon the appearance of the need and occasion contemplated by the agreement, the unfulfilled demands of the firm's creditors. * * * [441 F.2d at 1002.]

The majority's statement of the *Stahl* facts assumedly is derived from Judge Leventhal's analysis of those facts in relation to the Government's argument in that case. The Government espoused as a general rule that a loan of securities gives rise to a debt. After an examination of the intent of the widow Stahl and her broker, Judge Leventhal found the parties' obligations did not fairly include a *general* option to return the cash equivalent of the securities. Be that as it may, it is clear from the face of the documents entered into by the parties and reprinted by the district court that in limited circumstances the broker in *Stahl* could return to Mrs. Stahl the cash equivalent of the securities loaned. Therefore, Mrs. Stahl's contractual right to a return of the securities was subject to the claims of all present or future creditors of Balough & Company, in which event a money claim was created.

Similarly, in *Michtom* there was no general power to sell, but only a power to sell in response to a specified contingency—of the same essential nature as those in the *Stahl* facts: (1) to meet maturing obligations of Hayden Stone, (2) in the event of insolvency of Hayden Stone, or (3) upon the happening of certain events such as the bankruptcy of Hayden Stone. Even the Government apparently does not agree with the majority's distinction of *Stahl.* In its briefing to the court in the first *Michtom* decision and in the current consideration, the Government substantially analyzed the interrelationship of the *Stahl* opinion with

*Michtom.* In the face of rather extensive reliance on *Stahl* by the plaintiff, the Government never attempted to distinguish the two subordination agreements. In fact, the Government characterized Mrs. Stahl's arrangement as a "very similar subordination agreement [as Mr. Michtom's]." Ct.Cl. No. 253–76, Defendant's Brief filed September 4, 1979, at page 17. *See also* Defendant's Brief filed July 27, 1977, at page 32. In light of the above, the majority's attempt to distinguish *Stahl* from the present case is not convincing. The logical inference to be drawn from the majority's simplistic attempt to distinguish *Stahl* is that the majority believes the *Stahl* rationale is incorrect. If the majority does not wish to follow the rationale of *Stahl*, rather than attempting an oversimplified distinction of that case from the instant facts it should squarely face the issue and explain why *Stahl* is incorrect.

Additionally, since the majority decides not to follow *Stahl* there is a gap in the majority's analysis. In the first *Michtom* opinion, our finding that section 166 did not apply was premised on our reliance on the *Stahl* decision. By holding that *Stahl* is inapposite, the majority necessarily leaves unanswered the issue of the applicability of section 166. The majority opinion states:

> * * * Because the Government has dropped its contention that the 1970 loss is properly deductible under I.R.C. § 166, we need not decide whether what Mr. Michtom received on the sale of his stock by Hayden Stone is properly characterized as a debt.

I disagree.

The Supreme Court has held that where a debtor-creditor relationship is created the loss is governed by section 166, not section 165. *Putnam v. Commissioner,* 352 U.S. 82, 87, 77 S.Ct. 175, 177, 1 L.Ed.2d 144 (1956); *Spring City Foundry Co. v. Commissioner,* 292 U.S. 182, 189, 54 S.Ct. 644, 647, 78 L.Ed. 1200 (1934). Therefore, since defendant earlier argued the facts created a debtor-creditor relationship, and since the sole basis of our dismissal of that contention (i. e., *Stahl*) has now been abrogated by the ma-

jority, we necessarily must consider whether, without *Stahl*, there was a debtor-creditor relationship. Since the majority chooses not to follow the *Stahl* rationale, I feel the proper resolution of this case rests on section 166(d), not section 165 as the majority finds, apparently by default.

When Hayden Stone sold plaintiff's securities under the subordination agreement, a money claim was created against Hayden Stone in favor of Mr. Michtom. This arrangement can be properly characterized under Treas.Reg. § 1.166–1(c) as a bona fide debt (i. e., arising from a "debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed and determinable sum of money" ($127,764.55)). The receipt of H. S. Equities, Inc. preferred stock was in satisfaction of this debt—rendering it partially worthless.[1] Because the debt is only partially worthless, plaintiff is allowed no deduction for 1970. Section 166(d)(1)(B). Finally, there is a capital loss in 1974 upon the sale of the preferred stock for $2,500.

---

1. I would not find this transaction to be a "retirement" of an evidence of indebtedness within the reach of section 1232(a)(1). However, this is another issue which has escaped any consideration by the majority.